No. 14-16310

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Joseph Rudolph Wood III, Plaintiff-Appellant,

vs.

Charles L. Ryan, et al., Defendants-Appellees.

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:14-cv-01447-NVW-JFM

## OPENING BRIEF OF PLAINTIFF-APPELLANT

JON M. SANDS
Federal Public Defender
District of Arizona
Dale A. Baich
Robin C. Konrad
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
dale_baich@fd.org
robin_konrad@fd.org

Attorneys for Plaintiff-Appellant Joseph R. Wood

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ...................................................................... v

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION ........................................................... 2

ISSUES PRESENTED FOR REVIEW ....................................................... 2

STATEMENT OF THE CASE ................................................................... 3

FACTS .................................................................................................. 4

PRELIMINARY INJUNCTION STANDARD AND STANDARD OF REVIEW ............................................................................................... 7

SUMMARY OF THE ARGUMENT ........................................................... 8

ARGUMENT ........................................................................................ 10

I.   The district court's determination that Mr. Wood was unlikely to succeed on his First Amendment right-of-access claim was an abuse of discretion. ......................................................................................... 10

   A.   There is a First Amendment right of access to execution proceedings and records related to those proceedings. .................................... 10

      1.   Right of access to criminal proceedings generally. .............................. 12

      2.   Right of access to the execution stage of criminal proceedings in particular. ..................................................................................... 14

      3.   The public is entitled to records associated with a criminal proceeding to which a First Amendment right of access has attached. ........ 17

      4.   The district court ignored Supreme Court and this Court's precedent. ...................................................................................... 19

B.   Information about the suppliers of products used in carrying out executions has been historically open to the public..........................19

   1.   General history of openness regarding executions ..............................22

      a.   Hanging ...............................................................22

      b.   Gas Chamber.................................................26

      c.   Other methods of execution ..............................28

   2.   ADC's history related to information about lethal-injection drugs..................................................................31

      a.   ADC concealed information that related to its violation of federal law.............................................31

      b.   Since 2010, ADC has released drug-related information of the type at issue here without claiming that confidentiality applied. ............34

   3.   The district court's conclusion that there is no authority to support the proposition that the requested information has historically been open to the press and general public is clearly erroneous...................................................36

C.   The district court's finding that the requested information was unnecessary in playing a significant positive role in the functioning of the particular proceeding in question was based on findings outside the record. ...............................................37

D.   The district court's reliance on non-binding precedent compounded its error in determining that there was no likelihood of success on Mr. Wood's First Amendment claim............................45

II.   Mr. Wood meets the other requirements for a preliminary injunction........51

A.   If Mr. Wood is executed without injunctive relief, he will suffer irreparable harm ...............................................51

B.    The balance of equities tips in Mr. Wood's favor ...................................52

C.    The public interest weighs in favor of issuing an injunction...................52

III.  Mr. Wood has not been dilatory. ...................................................................53

CONCLUSION ........................................................................................................54

STATEMENT OF RELATED CASES ....................................................................55

CERTIFICATE OF COMPLIANCE.......................................................................56

CERTIFICATE OF SERVICE ................................................................................57

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127
(9th Cir. 2011) ...............................................................7, 8, 53

*Associate Press v. United States District Ct. for Central District of
California*, 705 F.2d 1143 (9th Cir. 1983) ...............................17

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) .................11, 51, 52

*CBS, Inc. v. U.S. District Court*, 765 F.2d 823 (9th Cir.1985) ....................17

*Cal-Almond, Inc. v. U.S. Department of Agricultural*, 960 F.2d 105
(9th Cir. 1992) .......................................................................46

*California First Amendment Coalition v. Woodford*, 299 F.3d 868
(9th Cir. 2002) ...................................................................*passim*

*Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013)....................................................33

*Courthouse News Serv. v. Planet*, 750 F.3d 776 (9th Cir. 2014) .................17

*Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011) ......................................8

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989).................................................46

*Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596 (1982)....................*passim*

*Goldie's Bookstore Inc. v. Super. Ct. of Calif.*, 739 F.2d 466 (9th Cir.
1984).........................................................................................52

*H-D Michigan, LLC v. Hellenic Duty Free Shops, SA*, 694 F.3d 827
(7th Cir. 2012) .......................................................................21

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) .................................................46

*Landrigan v. Brewer*, 625 F.3d 1132 (9th Cir. 2010) ...................................40

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012)........................................7, 51

*McBurney v. Young*, 133 S. Ct. 1709 (2013)...................................................46

*Mills v. Alabama*, 384 U.S. 214 (1966)..........................................................12

*Nelson v. Campbell*, 541 U.S. 637 (2004)......................................................53

*New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286 (2d Cir. 2012) ....................................................................17

*Offutt v. United States*, 348 U.S. 11 .............................................................13

*Oregon Natural Resource Council v. Marsh*, 52 F.3d 1485 (9th Cir. 1995)..............................................................................................................8

*Pell v. Procunier*, 417 U.S. 817 (1974)..........................................................50

*Press-Enterprise Co. v. Super. Ct.*, 464 U.S. 501 (1984)........................11, 13

*Press-Enterprise Co. v. Super. Ct.*, 478 U.S. 1 (1986)..........................*passim*

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ...11, 12, 13, 17

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002)............................................................................................................52

*Seattle Times Co. v. U.S. District Court for W. District of Wash.*, 845 F.2d 1513 (9th Cir. 1988)................................................................11, 18

*Thornhill v. Alabama*, 310 U.S. 88 (1940).....................................................13

*Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012) ..........................................51

*Trop v. Dulles*, 356 U.S. 86 (1958) ...............................................................16

*United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983) ...............................11

*United States v. Criden*, 675 F.2d 550 (3d Cir.1982)...................................14

*United States v. McVeigh*, 106 F.3d 325 (10th Cir. 1997) ...........................14

*United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009) ......21

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ...............................52

*Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7 (2008) ..........7

## STATE CASES

*Owens v. Hill*, 2014 WL 2025129 (Ga. May 19, 2014) ...................46, 47, 49

*Schad v. Brewer*, No. 2:13-cv-13-02001-ROS, 2013 WL 5551668
    (D. Ariz. Oct. 7, 2013).......................................................................*passim*

*Wellons v. Commissioner, Ga. Department of Correction*, 2014 WL
    2748316 (11th Cir. June 17, 2014).....................................................46, 50

*West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 6724628
    (D.Ariz. Dec. 21, 2011) ............................................................................44

## DOCKETED CASES

*Landrigan v. Brewer*, No. 2:10-cv-02246-ROS (D. Ariz.) ...........................32

*State v. Cook*, No. CR-88-0301-AP (Ariz. Sup. Ct.)....................................33

*State v. Landrigan*, No. CR-90-0323-AP (Ariz. Sup. Ct.) .....................33, 34

*State v. Wood*, No. CR-91-0233-AP (Ariz. Sup. Ct.)................................3, 4,

## FEDERAL STATUTES

42 U.S.C. § 1983................................................................................................3

28 U.S.C. § 1292................................................................................................2

28 U.S.C. § 1331................................................................................................2

28 U.S.C. § 1343................................................................................................2

28 U.S.C. § 2201.................................................................................2

28 U.S.C. § 2202.................................................................................2

## MISCELLANEOUS

Stuart Banner, The Death Penalty: An American History (Harvard
     Univ. Press 2002) ............................................................*passim*

Robert M. Bohm, DeathQuest: An Introduction to the Theory and
     Practice of Capital Punishment (Elsevier 2012) ......................22

Scott Christianson, The Last Gasp: The Rise and Fall of the American
     Gas Chamber (Univ. Cal. Press 2010) ........................25, 26, 27

Deborah Denno, *Is Electrocution an Unconstitutional Method of
     Execution? The Engineering of Death Over the Century*, 35 Wm.
     & Mary L. Rev. 551 (1994)....................................................30

Ken Driggs, *A Current of Electricity Sufficient in Intensity to Cause
     Immediate Death: A Pre-Furman History of Florida's Electric
     Chair*, 22 Stetson L. Rev. 1169 (1993) ....................................22

Frederick Drimmer, Until You Are Dead: The Book of Executions in
     America (Citadel Press 1990)............................................*passim*

Mark Essig, Edison & the Electric Chair: A Story of Light and Death
     (Walker & Co. 2003)...............................................................29

Louis P. Masur, Rites of Execution: Capital Punishment and the
     Transformation of American Culture, 1776-1865 (Oxford Univ.
     Press 1989) ............................................................................25

Ellyde Roko, Note, *Executioner Identities: Toward Recognizing a
     Right to Know Who is Hiding Beneath the Hood*, 75 Fordham L.
     Rev. 2791 (2007) ...................................................................48

## INTRODUCTION

This is a simple and straightforward case. It presents the question of whether the long-established First Amendment right of access to historically open governmental proceedings, which this Court has already held extends to executions, includes not just a right to view executions, but also to have access to records revealing information related to how the executions will be carried out.

There is a right of access to governmental proceedings that have been historically open to the public, and access to those proceedings is significant to ensuring proper functioning of government. Throughout the history of our nation, executions have been open to the public. Consequently, the First Amendment grants a right of access to information that is important to the understanding of and discourse about executions, and about the particular method of execution in question.

In Arizona, there have been three methods of execution: hanging, lethal gas, and lethal injection. The nooses used to carry out the twenty-eight hangings are on display at the Pinal County Historical Museum in Florence, Arizona. The Eaton Metal Products Company was the manufacturer of the gas chamber that still sits at the Arizona State Prison. Public access to this information is the modern-day equivalent of displaying vials that contained the lethal drug, or providing the name

of the manufacturer or distributor of the drugs that will be used to carry out executions by lethal injection.

Here, Arizona is preparing to go forward with the most significant action that a government can take—ending the life of one its citizens. There is ongoing debate about the death penalty in the United States and in Arizona. To further that debate, Plaintiff-Appellant has asked for records related to the drugs that will be used, the legal and professional qualifications of the executioners, and the process by which Arizona developed its current drug protocol. The information requested is crucial to the functioning of lethal injection—like the rope or the gas chamber—and it ensures the proper functioning of the execution process as well as promotes public confidence in the criminal justice system.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331, § 1343, § 2201, and § 2202. This appeal is from an order denying a motion for preliminary injunction, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED FOR REVIEW

Whether the district court abused its discretion by finding Mr. Wood is unlikely to succeed on the merits of his First Amendment claim, where the district court:

A.    Ignored binding precedent supporting a right of access to execution proceedings and related records;

B.    Concluded that because there is no appellate authority holding that information about lethal-injection drugs has been historically available, then no history of openness related to information about execution proceedings exists;

C.    Relied upon findings outside the record in determining that the requested information plays no significant positive function in the execution proceedings; and

D.    Relied upon non-binding authority that contradicts this Court's precedent.

## STATEMENT OF THE CASE

On June 26, 2014, Plaintiff-Appellant Joseph Rudolph Wood III and five other plaintiffs filed a Complaint for Equitable, Injunctive, and Declaratory Relief pursuant to 42 U.S.C. § 1983, in the United States District Court for the District of Arizona. *Wood v. Ryan*, Case No. 2:14-cv-01447-NVW-JFM (D. Ariz.), filed June 26, 2014 (Dist. Ct. ECF No. 1). On July 2, 2014, Mr. Wood, who has a pending execution date scheduled for July 23, 2014,[1] filed a Motion for Preliminary Injunction or Temporary Restraining Order. (Dist. Ct. ECF No. 11.) Pursuant to

---

[1] Warrant of Execution, *State v. Wood*, No. CR-91-0233-AP (Ariz. Sup. Ct. May 28, 2014) (setting date of execution for July 23, 2014).

the district court's scheduling order, Defendants filed their response on July 7 (Dist. Ct. ECF No. 15), and Mr. Wood filed his reply the next day (Dist. Ct. ECF No. 16). The district court heard oral argument on the motion the following day. (Dist. Ct. ECF No. 17.) On July 10, the district court issued its order denying Mr. Wood's motion. (Order, July 10, 2014, Dist. Ct. ECF No. 21, ER 003) (hereinafter "Order").) That same day, Mr. Wood filed his timely notice of appeal. (Dist. Ct. ECF No. 22, ER 001.)

## FACTS

The State moved for a warrant of execution in Mr. Wood's case on April 22, 2014.[2] After that date, Defendants and Mr. Wood exchanged a series of letters involving requests for several categories of execution-related information, including information about the drugs that the Arizona Department of Corrections (ADC) intends to use in his execution; about the qualifications of personnel who are expected to participate in his execution; and about the manner in which ADC developed its current lethal-injection drug protocol. (Order at 2-4, ER 004-006.)

Defendants declined to provide most of the specific information that Mr. Wood requested. (Order at 2-4, ER 004-006.) Instead, they asserted in two letters that ADC intended to use a two-drug protocol using midazolam and hydromorphone, but would also continue to look for pentobarbital. (Order at 2, ER

---

[2] Mot. For Warrant of Execution, *State v. Wood*, No. CR-91-0233-AP (Ariz. Sup. Ct. April 22, 2014).

004.)  Defendants provided a few "public-records" documents containing emails, and redacted documents relating to the acquisition of drugs.  (Order at 2-4, ER 004-006.)  ADC declined to provide further information about the drugs, citing Arizona's executioner-confidentiality statute.  (Order at 3, ER 005.)[3]

On June 26, 2014, Mr. Wood and other plaintiffs filed a lawsuit alleging, *inter alia*, that Defendants' actions violated Plaintiffs' First Amendment rights. (Compl., Dist. Ct. ECF No. 1.)  In a letter dated June 25 but received by Mr. Wood's counsel on June 28, Defendant Ryan expressly stated: "the purpose of this correspondence is to notify you that the two-drug protocol using Midazolam and Hydromorphone will be used to carry out the execution scheduled for July 23, 2014."  (Exs. to Reply, Dist. Ct. ECF No. 16-1, Ex. M, ER 178; *see also* Order at 5, ER 007.)  This letter is consistent with ADC's execution protocol that gives ADC's director the discretion to decide "which lethal chemical(s) will be used for the scheduled execution." (Exs. to Mot., Ex. I at Attach. D § C(1), ER 101).  The protocol also states that the Director's "decision will be provided to the inmate in writing 20 calendar days prior to the scheduled execution date."  (*Id.*, ER 101.) Before Mr. Wood received this notice, he was not certain of the drug protocol to be used.  (Hr'g Tr., July 9, 2014, 23:16-19, ER 040-042) ("The Court:    the

---

[3] *See* Ariz. Rev. Stat. § 13-757(C) (protecting the identity of "executioners and other persons who participate or perform ancillary functions in an execution" from public disclosure).

Department is explicitly saying this is how we're going to do it and this is the drugs we're going to use unless we do it some other way. Isn't that the message you gave them right until [June] 28th?" Counsel for Defendants: "Yes. That's what it says in the letters.").

On July 2, 2014, Mr. Wood filed his motion for a preliminary injunction asking the district court to stay his execution unless or until Defendants provided the information he sought about the execution process. Mr. Wood asserted that he could show a likelihood of success on Claim Two—that by concealing information about the execution process, Defendants have violated his First Amendment rights. After briefing, the district court heard argument. The court recounted some of the history of ADC's inability to follow its previous protocols:

> I have had two previous cases, . . . and . . . the [ADC] came into court and avowed to me what they were going to do, that their plan or their protocol was constitutional, that's really what they are going to do, and therefore, I should adjudicate that that was constitutional. And I concluded, obviously, in each of those instances that there was a case or controversy and I rendered my best judgment. Well, it turns out the defendant got up to the Court of Appeals and changed things, sometimes under pressure from the judges in oral argument. . . . I was simply giving advisory opinions to give the defendants leverage to negotiate with the Court of Appeals. They didn't stand by the rulings that I gave. . . . So I think when we were last here in the previous case, I didn't mention that, but it certainly raises a question in my mind from experiences as to whether I can rely on the Department's avowals this is what they are going to do . . . .

(Hr'g Tr. at 29:21-30:17, ER 046-047.)

6

The judge even wondered "if [he] should just simply enter an injunction stopping the Department from executing this defendant until they can come to the Court and persuade [him], contrary to prior experience, that they are actually going to do what they are asking [him] to adjudicate the constitutionality of." (Hr'g Tr. at 30:22-31:2, ER 047-048.) Despite the court's expressed concerns, however, it denied Mr. Wood's motion. (Order at 15, ER 017.)

## PRELIMINARY INJUNCTION STANDARD AND STANDARD OF REVIEW

To be entitled to a preliminary injunction, a plaintiff must demonstrate (1) that he will likely succeed on the merits of his claim; (2) that without preliminary relief, he will likely suffer irreparable harm; (3) that "the balance of equities tips in his favor"; and (4) that "an injunction is in the public interest." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (alteration in original)). "The elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

This Court reviews the denial of a preliminary injunction for an abuse of discretion. *Diouf v. Napolitano*, 634 F.3d 1081, 1084 (9th Cir. 2011). "The district court abuses its discretion when its 'decision is based on an erroneous conclusion of law or when the record contains no evidence on which [it] rationally could have based that decision.'" *Oregon Natural Res. Council v. Marsh*, 52 F.3d 1485, 1492 (9th Cir. 1995) (citations omitted) (alteration in original). This Court will review findings of fact for clear error and conclusions of law de novo. *Alliance for the Wild Rockies*, 632 F.3d at 1131.

## SUMMARY OF THE ARGUMENT

The district court denied Mr. Wood's motion for preliminary injunction solely on the basis that the court determined Mr. Wood could not show a likelihood of success on the merits of the claim. (Order at 15, ER 017.) The district court's denial of injunctive relief was an abuse of discretion in four ways. First, the district court found that this Court's decision in *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 868 (9th Cir. 2002), "does not extend a First Amendment right to information" at issue in this case. (Order at 13, ER 015.) This is inconsistent with well-established principles of First Amendment law and with this Court's precedent.

Second, the court found that there was "no authority for the proposition that the press and general public have historically been granted access to information

8

identifying [ ] the manufacturer of lethal-injection drugs." (Order at 12, ER 014.) This conclusion is based on an unsupported premise that there must be existing appellate authority to find a right of access to governmental information.

Third, the court determined that information related to the source of lethal-injection drugs "would not 'play[] a significant positive role in the functioning' of the death penalty. The available information is sufficient for an 'informed public debate.'" (Order at 12, ER 014 (citations omitted) (alteration in original).) In reaching this erroneous conclusion, the court relied upon evidence that was not in the record. and adopted reasoning that was not presented by Defendants.

Finally, the court relied upon two out-of-circuit cases as a basis for rejecting a prior decision of the district court, which found that "the public must have reliable information about the lethal injection drugs themselves in order to judge the propriety of the particular means used to carry out an execution." (Order at 10, ER 012) (*citing Schad v. Brewer*, No. 13-cv-2001-PHX, 2013 WL 5551668, at*5 (D. Ariz. Oct. 7, 2013) (unpublished order).) The cases offer no precedential value, and reach results that are contrary to this Court's precedent. Because the district court based its finding on erroneous conclusions of law, and because it reached a decision without evidence to rationally support its decision, the order must be reversed.

9

Mr. Wood can show a likelihood of success on the merits of his claim. The other three factors for a preliminary injunction weigh in Mr. Wood's favor. He has already suffered irreparable harm by being denied his First Amendment rights. Further, the balance of equities tips in his favor because Defendants are violating his constitutional rights, and there is a significant public interest in upholding First Amendment principles.

Finally, Mr. Wood has not delayed in seeking injunctive relief. He has sought, repeatedly, this information from Defendants since he learned that the State was seeking a warrant of execution. He then filed his motion only three business days after receiving notice, as mandated by Defendants' own execution protocol, of the manner by which his execution will be carried out. As such, it is the actions and procedures of Defendants, not Mr. Wood, that have caused the delay. Mr. Wood is entitled to relief.

## ARGUMENT

**I.    The district court's determination that Mr. Wood was unlikely to succeed on his First Amendment right-of-access claim was an abuse of discretion.**

### A.    There is a First Amendment right of access to execution proceedings and records related to those proceedings.

The public has an affirmative, enforceable right of access to certain government proceedings in the criminal system and records associated with those proceedings. *Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 8-14 (1986) (*Press-*

10

*Enterprise II*); *Press-Enter. Co. v. Super. Ct.*, 464 U.S. 501, 510–11 (1984) (*Press-Enterprise I*); *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 603–11 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980).  Right of access attaches specifically where (a) proceedings or records are historically open to the public and (b) public access to the specific proceedings or records plays a significant positive rule in the functioning of government.[4]  *Press-Enterprise II*, 478 U.S. at 8 (citing *Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 604 (1982)).

Historically, executions have been open to the public, and the manner of execution has likewise been disclosed to the public.  *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868; *see also Associated Press v. Otter*, 682 F.3d 821, 822-23 (9th Cir. 2012) (reaffirming that *California First Amendment Coalition* is "settled law" and "binding precedent").  Public access to information about executions ensures the proper functioning of the process and promotes public confidence in the criminal justice system.  "Independent public scrutiny—made possible by the public and media witnesses to an execution—plays a significant role in the proper functioning of capital punishment." *Id.* at 876.

---

[4] This Court has indicated that a lack of "history and the prevalent use of [the procedure in question] should not automatically foreclose a right of access," and that the second prong of *Press-Enterprise II* may nevertheless weigh in favor of a First Amendment right of access. *Seattle Times Co. v. U.S. Dist. Court for W. Dist. of Wash.*, 845 F.2d 1513, 1516-17 (9th Cir. 1988); *accord United States v. Chagra*, 701 F.2d 354, 363 (5th Cir. 1983).

In this case, the district court determined that *California First Amendment Coalition* held only that the public has a First Amendment right to *view* executions, but that there was no right of access to documents and information about the execution process.  (Order at 11, ER 013.)  In reaching this conclusion, the lower court ignored well-established principles of First Amendment law regarding access to records related to a historically open governmental proceeding.  The district court's reading of *California First Amendment Coalition* is inconsistent with the Supreme Court's and this Court's precedent.  Therefore the district court reached an erroneous legal conclusion by finding that Mr. Wood could not demonstrate a likelihood of success on the merits of his claim.

### 1.    Right of access to criminal proceedings generally.

The right of access to certain government proceedings is founded upon "the common understanding that a major purpose of the First Amendment was to protect the free discussion of governmental affairs." *Globe Newspaper*, 457 U.S. at 604 (internal citations omitted) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).  The First Amendment's "expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Richmond Newspapers*, 448 U.S. at 575.  "By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of

self-government." *Globe Newspaper*, 457 U.S. at 604 (1982) (citing *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940)).

The right of access attaches to criminal proceedings because of both the historical openness of the proceedings and the fact that public access to those proceedings plays a significant positive role in the functioning of the system. The "historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." *Richmond Newspapers*, 448 U.S. at 569. "The accusation and conviction or acquittal, *as much perhaps as the execution of punishment*" are core components of our system of historically-open criminal proceedings. *See id.* at 571 (citation omitted) (emphasis added).

Moreover, the Supreme Court has explained that "[t]o work effectively, it is important that society's criminal process 'satisfy the appearance of justice,' which can best be provided by allowing people to observe such process." *Richmond Newspapers*, 448 U.S. at 556 (quoting *Offutt v. United States*, 348 U.S. 11, 14)). "Openness enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the criminal justice system." *Press-Enterprise I*, 464 U.S. at 501. "Public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process." *Globe Newspaper*, 457 U.S. at 606.

13

Further, in recognizing a First Amendment right of access to information about criminal proceedings, the Supreme Court has carefully detailed a variety of reasons public access plays a significant role in the functioning of our criminal justice system. To summarize, the non-exclusive list of benefits includes: "informing the public discussion of government affairs, assuring the public perception of fairness, promoting the community-therapeutic effect of criminal justice proceedings, providing a public check on corrupt practices, intimidating potential perjurers, and generally enhancing the performance of all involved in the process." *See United States v. McVeigh*, 106 F.3d 325, 336 (10th Cir. 1997) (citing *Globe Newspaper Co.*, 457 U.S. at 604–05; *United States v. Criden*, 675 F.2d 550, 556 (3d Cir.1982)).  Openness in criminal proceedings serves an important role because "public access to criminal trials permits the public to participate in and serve as a check upon the judicial process-an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience."  *Id.*  When the government carries out a death sentence, the execution represents the final stage of a defendant's criminal proceedings.

### 2. Right of access to the execution stage of criminal proceedings in particular.

Consistent with the Supreme Court's clearly established principles related to criminal proceedings, information about the manner and methods of executions has

been historically available to the public and is important for the proper functioning of democracy.  In the controlling case here, this Court considered the question of "how the constitutional principles that animate granting public access to governmental proceedings—particularly those comprising the process of trying, convicting and sentencing criminal defendants—carry over to the process of executing a condemned inmate within the confines of the prison."  *Cal. First Amendment Coal.*, 299 F.3d at 874.  In answering that question, the Court conducted the necessary analysis under *Press-Enterprise II*, and concluded by finding both that executions have been historically open to the public, and that public access to executions plays a significant positive role in the functioning of government.

First, relying on multiple sources, this Court has found that "[h]istorically, executions were open to all comers." *Cal. First Amendment Coal.*, 299 F.3d at 875. Even as the methods of executions have changed, a long-standing pattern of public access has remained the baseline.  *Id.* at 876 (noting that the public viewed executions by hanging and by lethal gas).  Moreover, even after the executions moved from the public square to behind the prison walls, the public was still permitted access to this stage of the criminal proceedings.  *Id.* at 875-76.  Thus, because executions have been "fully open events in the United States," the Court held that "historical tradition strongly supports the public's First Amendment

right" of access to information regarding the entire execution process.  *See Cal.*

*First Amendment Coal.*, 299 F.3d at 875-76.

Second, the Court offered detailed explanation as to why public access to executions serves functional importance.  The Court stressed the import of "independent public scrutiny" in ensuring "the proper functioning of capital punishment."  *Id.* at 876.  Where the public is permitted to scrutinize a governmental process, it "enhances the quality and safeguards the integrity" of the process.  *Id.* (*quoting Globe Newspaper*, 457 U.S. at 606).  Moreover, the Court found that "an *informed* public debate is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" *Id.* at 876 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)) (emphasis added).  "[T]he citizens must have reliable information" in order to determine whether "executions are fairly and humanely administered[.]"  *Id.* (citing *Globe Newspaper*, 457 U.S. at 606).

Thus, under this Circuit's precedent, an execution is a historically open governmental proceeding, the openness of which plays a significant positive role in governmental functioning.  As such, the public has a First Amendment right of access to that stage of the criminal proceeding.

### 3. The public is entitled to records associated with a criminal proceeding to which a First Amendment right of access has attached.

This Court has held that "the public and the press have a right of access to criminal proceedings and documents filed therein[.]" *Cal. First Amendment Coal.*, 299 F.3d at 874 (quoting *CBS, Inc. v. U.S. Dist. Court*, 765 F.2d 823, 825 (9th Cir.1985)).  Both criminal proceedings and the documents related to those proceedings are "important to a full understanding of the way in which the 'judicial process and the government as a whole are functioning.'" *Assoc. Press v. United States Dist. Ct. for Cent. Dist. of California*, 705 F.2d 1143, 1145 (9th Cir. 1983). Indeed, "the appearance of justice can best be provided by allowing people to observe it." *Richmond Newspapers*, 448 U.S. at 572.

Moreover, this Court has made clear that the First Amendment right to access extends to the records and documents associated with historically open proceedings. *Courthouse News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014). Deciding whether openness plays a significant role in the functioning of the process "requires an understanding of what the function of a particular process is and an evaluation of the role of openness in it." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 302 (2d Cir. 2012).

In other words, the First Amendment grants a right of access to information that is important to the understanding of and discourse on the particular process in

17

question.  The First Amendment grants a right of access to information about the manner and method of executions because that information is crucial to the functioning of capital punishment. *See Cal. First Amendment Coal.*, 299 F.3d at 877; *see also Seattle Times Co. v. U.S. Dist. Court for W. Dist. of Wash.*, 845 F.2d 1513, 1517 (9th Cir. 1988) (citation omitted) (documents related to pretrial proceedings "are often important to a fully understanding of the way in which the judicial process and the government as a whole are functioning").  Public access to the details of executions serves to foster "an appearance of fairness," and heightened "public respect for the judicial process." *Cal. First Amendment Coal.*, 299 F.3d at 877 (citations omitted).  The "functional importance of public access to executions" also demonstrates there is a First Amendment right to access the execution details "that are inextricably intertwined with the process" of capital punishment. *Id.*  Under the constitutional framework, then, the records related to the drugs to be used in an execution, the government's reason for determining a particular method or drug amount, and the details regarding qualifications of the executioner, are all necessary parts of the execution process.  This information is critical to carrying out a death sentence and is necessary to allow the public to assess if capital punishment is functioning as it should.[5]

---

[5]  Once the First Amendment right of access "attaches to a governmental proceeding, that right 'may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored

### 4. The district court ignored Supreme Court and this Court's precedent.

In its order, the district court failed to apply the Supreme Court's and this Court's precedent, which holds that the public may access records related to an open governmental proceeding to which a First Amendment a right of access attaches. By failing to apply the proper legal analysis and the correct law, the district court reached a conclusion that cannot withstand this Court's precedent. Because the district court abused its discretion in finding there was no likelihood of success on the merits of this claim, this Court should reverse the order denying relief to Mr. Wood.

### B. Information about the suppliers of products used in carrying out executions has been historically open to the public.

One part of the analysis is determining "whether the place and process have historically been open to the press and general public." *Cal. First Amendment Coal.*, 299 F.3d at 875 (quoting *Press–Enter*.II, 478 U.S. at 8-9). As to this part, the district court determined that Mr. Wood "cited no authority for the proposition that the press and general public have historically been granted access to information identifying the manufacturer of lethal-injection drugs." (Order at 12, ER 014.) During argument, the district court asked counsel for Mr. Wood for

---

to serve that interest.'" *Cal. First Amendment Coal.*, 299 F.3d at 877 (quoting *Press-Enter. II*, 478 U.S. at 9). Here, Defendants have offered no interest—let alone an overriding interest—that this information should not be disclosed.

"appellate authority that gives the First Amendment right to any of those" "three categories of documents that you are seeking." (Hr'g Tr. at 6:2-5, ER 023.) Counsel noted that no appellate court has had the opportunity to reach the issue. (Hr'g Tr. at 6:6-7 ER 023.) Nevertheless, counsel for Mr. Wood urged that in recent history, "the defendants have provided information regarding suppliers of the catheters that are used in the execution, of the restraint belts. . . . They have not claimed that that information is confidential." (Hr'g Tr. at 13:4-8, ER 030.) The drug manufacturers, like companies who manufacture and supply catheters, are providing supplies to be used in executions that have not historically been kept confidential. (Hr'g Tr. at 13:3-11, ER 031.) Further, the district court concluded that if the type of requested information has been disclosed in the past, it was only through court order or in discovery. But the fact that Defendants disclosed this information in discovery—without classifying it as protected under the existing protective order—lends support for the fact that this information should be made public.

While it is true that there is no appellate court that has addressed these specific facts,[6] that is not the correct analysis that the district court should have

---

[6] A similar issue was decided in October 2013 by the U.S. District Court for the District of Arizona, which found that the public did, in fact, have a First Amendment right of access to information regarding the drugs to be used in executions. *See Schad*, 2013 WL 5551668. Defendants did not appeal that decision.

20

undertaken.  *See, e.g.*, *H-D Michigan, LLC v. Hellenic Duty Free Shops, SA*, 694 F.3d 827, 846 (7th Cir. 2012) ("[C]ourts are equipped to handle both contested facts and novel legal questions. Neither poses a categorical bar to a preliminary injunction"); *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 698 (9th Cir. 2009) ("Lacking precedent on what is admittedly a novel issue of law, the district court did not adequately develop the record.").  If the district court had conducted an evidentiary hearing before ruling instead of making findings when no record was before it and the parties had not briefed that specific issue, then evidence would have been offered to demonstrate that the public and the press have long had access to identifying information about the manufacturers of devices and chemicals used to carry out executions.

Here, the materials used in carrying out executions historically are analogous to the current day use of lethal-injection drugs in lethal injection: rope used in hanging; lethal gas used in the gas chamber; high-voltage alternating current used in the electric chair; and rifles used in firing squads.[7]  This information is consistent with the holding in *California First Amendment Coalition* that

---

[7] The district court in *Schad* made a similar analogy.  2013 WL 5551668, at*5 ("With historical executions, the actual means of execution was open and obvious to the public: rope, sodium cyanide gas, and electricity. The public could not only view the prisoner's death, they could see the precise cause and its effects. The public and the press therefore historically were allowed to see the specific means used to execute the prisoner.").

executions have been historically open events in the United States. 299 F.3d at 875.

### 1.  General history of openness regarding executions

#### a.    Hanging

Roughly seventy percent of executions in American history have been by hanging.  Robert M. Bohm, DeathQuest: An Introduction to the Theory and Practice of Capital Punishment 130 (Elsevier 2012).  Hangings were public, open, and democratic.  *See generally* Stuart Banner, The Death Penalty: An American History 10-11, passim (Harvard Univ. Press 2002).  The local sheriff was the executioner.  Ken Driggs, *A Current of Electricity Sufficient in Intensity to Cause Immediate Death: A Pre-Furman History of Florida's Electric Chair*, 22 Stetson L. Rev. 1169, 1183-85 & n.52 (1993); Banner, *supra*, 36, 169-76.

Details about the ropes used in hangings were part of the open execution process. Ropes were manufactured specifically for executions.  The execution ropes were of a specific type—usually hemp of a thick diameter.  Frederick Drimmer, Until You Are Dead: The Book of Executions in America 127 (Citadel Press 1990).  Public accounts included detailed information about the ropes used and the tradesmen and companies who supplied them.  For example:

> The ropes with which Jackson and Walling are to be hung have been completed and delivered over to Sheriff Plummer.  Each rope is 23 feet in length, and they were made to order in about a week's time from the giving of the order.  They were made by Frank Vonderheide,

the Main Street cordage dealer, and most of the work was done by Mr. Vonderheide himself. They are made of what is known as silver finish flax sewing twine, there being four strands of 110 threads each, or 440 threads in all. A peculiarity about the two ropes is that the one intended for Jackson has one red thread in all of the four strands, while that made for Walling has one black thread in all of the four strands. This thread was run in the ropes by the order of Sheriff Plummer, who desires to keep them separate and easily identified from each other. The four red threads in the one and black threads in the other give the ropes a peculiar appearance, and serve to intensify the realization of the direct preparation for the grewsome [sic] event. It brings out the uncanny aspects of the manufacture of a strong and pliable rope that is the best and most perfect product of a ropemaker, and yet that has but one brief use to serve in the world, that is to be accomplished in a second—the taking of a man's life.[8]

Pennsylvania used the same hanging-rope supplier for more than a half century, as Godfrey Boger's obituary attested:

A gentle mannered and delicately featured man named Godfrey Boger, who has just died in Philadelphia. . . .For 57 years he had made all the ropes used in legal executions in his own state and had met like demands in a number of others.
[¶]

---

[8] *The Ropes Made, A peculiar mark of identification upon each*, Cincinnati Enquirer, March 16, 1897, at 12, described by Chris Woodyard, Haunted Ohio, *Enough Rope: The Hangman's Rope in the Press at* http://hauntedohiobooks.com/news/enough-rope-the-hangmans-rope-in-the-press/ (last visited July 12, 2014); *see also Hanged*, *Jackson and Walling Jerked Into Eternity*, Spokane Daily Chronicle, at 1, Mar. 20, 1897, *available at* http://news.google.com/newspapers?id=a7RXAAAAIBAJ&sjid=1PMDAAAAIBAJ&pg=1705%2C2115029 (last visited July 12, 2014); *Hanged Together, Jackson and Walling, Partners in Crime, Executed in Kentucky*, Clinton Morning Age, at 1 March 21, 1897, *available at* http://news.google.com/newspapers?id=Wt8mAAAAIBAJ&sjid=1QIGAAAAIBAJ&pg=5431%2C2542364 (last visited July 12, 2014).

He took pride in the fact that of all the ropes made by him in his long service only one had ever broken, . . .[9]

An Ohio newspaper reported the following account of the local hanging rope industry:

> [A] somewhat ghastly manufacture is carried on in Cincinnati—the manufacture of hangman's ropes. The manufacturers are, however, proud of their industry, and have, according to the *American Register*, recently written in the following terms to a Sheriff in Arkansas. "We manufacture the best hangman's rope in the market . . . We have given long study to hanging, regarding it as one of the finer arts of civilization.[10]

When John Brown was executed in 1859, three states vied to provide the rope. Drimmer, *supra*, 159. Kentucky won out over South Carolina and Missouri. *See id.* The rope was apparently displayed in public for several days before the execution, and media articles about the rope were widespread.[11]

---

[9] *Made Hangman's Ropes*, The Gazette Times at 13, July 16, 1911, *available at* http://news.google.com/newspapers?nid=1126&dat=19110716&id=O_9QAAAAIBAJ&sjid=JWYDAAAAIBAJ&pg=5942,5964817 (last visited July 12, 2014).

[10] Cincinnati Commercial Tribune, May 11, 1884 at 2, *available at* http://newspaperarchive.com/uk/middlesex/london/london-american-register/1884/04-19/page-11 (last visited July 12, 2014).

[11] Se*e, e.g.,* Lowell Daily Citizen and News, December 5, 1859, at 2 *available at* http://nkaa.uky.edu/record.php?note_id=1625 (last visited July 12, 2014); *see also* Last Day in John Brown's Life was Just a Century ago Today, Reading Eagle at 30, Dec. 5, 1959, *available at* http://news.google.com/newspapers?id='UgkrAAAAIBAJ&sjid=wpkFAAAAIBAJ&pg=5171%2C681271 (last visited July 12, 2014).

After an execution, the hanging rope and the wooden gallows frequently were cut up and taken or sold to the public as souvenirs. Louis P. Masur, Rites of Execution: Capital Punishment and the Transformation of American Culture, 1776-1865, at 26 (Oxford Univ. Press 1989); Drimmer, *supra*, 172; Banner, supra, 158, 161.

Arizona used hanging as a method of execution. http://www.azcorrections.gov/adc/history/History_DeathPenalty.aspx (last visited July 12, 2014). Twenty-eight hangings took place between 1910 and 1931, including the 1930 hanging of Eva Dugan whose "head was ripped from her body and went bouncing across the floor." http://open.salon.com/blog/laura_wilkerson/2011/04/26/dead_women_wook_3_beheaded_1930_arizona (last visited July 12, 2014); *see also* Scott Christianson, The Last Gasp: The Rise and Fall of the American Gas Chamber, at 100 (Univ. Cal. Press 2010). This spectacle prompted Arizona to change its method of execution from hanging to lethal gas. *See* Richard Ruelas, *Arizona executions, from hanging to gas to lethal injection*, Arizona Republic, Oct. 28, 2010, *available at* http://archive.azcentral.com/travel/articles/2010/10/28/20101028arizona-executions-hanging-gas-lethal-injection.html (last visited July 12, 2014). Even today, the Pinal County Historical Museum in Florence, Arizona, displays the actual nooses from each of the twenty-eight hangings carried out by the Arizona

State Prison beginning in 1910. *See* Pinal County Historical Soc. & Museum, *Our Exhibits*, www.pinalcountyhistoricalmuseum.org/exhibits.htm (last visited July 12, 2014).

### b.    Gas Chamber

Executions have also historically been carried out using lethal gas. In 1924, Nevada became the first state to use the gas chamber as a method execution. Christianson, *supra*, 73 (Univ. Cal. Press 2010). A professor and former overseer of the federal Public Health Service advised the State on what gas to use—cyanide—and on how to conduct the execution. Christianson, *supra*, 76.

The only company west of the Mississippi that made the gas, California Cyanide Company (CCC), openly contracted with Nevada to provide both the gas and the "autofumer" that sprayed the gas. CCC also provided a technician to help operate the machine. CCC, however, refused to transport the gas to Nevada because of the dangers inherent in transporting cyanide, and the State had to arrange transport itself. Christianson, *supra*, 76-77. Public accounts even identified the state employee who went to California to pick up the gas: Tom Pickett and his wife drove a truck to CCC to complete the transaction. *See id*. at 78. Other participants in the execution process were also a matter of public record, including the chemical expert who took control of the poison when it arrived in Nevada and the attending physicians at the execution. *Id*. at 78-79.

Arizona first used the gas chamber to conduct executions in 1934 and it is still a method of execution available in the state. http://www.azcorrections.gov/adc/history/History_DeathPenalty.aspx (last visited July 12, 2014); *see also* Ariz. Rev. Stat. 13-757(B).

The manufacturer of the gas chambers used in lethal gas executions in Arizona and numerous other states was publicly identified, and the specific details of the chamber are available today. The patent held by Eaton Metal Products, Co., and the specific dimensions and materials used in the construction and design of the chamber were described.[12]

In 1976, Horace Jackson, the Vice-President of Manufacturing at Denver-based Eaton Metal Products Co., was interviewed about the gas chambers Eaton supplied to eleven states, including Arizona. Jackson remarked that the "[t]he gas chambers were only a sideline for Eaton. Its workers turn out far less exotic items–petroleum tanks and anti-pollution equipment that provides ventilation and filtering capacity for a number of industrial purposes."[13] Jackson commented,

---

[12] *Eight States Now Are Using Gas Chambers for Executions*, Sarasota Herald Tribune, at 17 (Jan. 2, 1955), *available at* http://news.google.com/newspapers?nid=1755&dat=19550102&id=t-QhAAAAIBAJ&sjid=82QEAAAAIBAJ&pg=2642,267124 (last visited July 12, 2014); *see also* Christianson, *supra*, Appendix 1 (Patent Application).

[13] Bill Pardue, *After 20 on Sidelines, Gas Chamber Maker Stays Ready*, The Victoria Advocate, at 20B (Dec. 15, 1976), *available at*

"'[w]e are somewhat disturbed about who pulls the handle . . . . He's bound to have mental problems. We're trying to fix a way so no one knows who's the one.'" *Id*. Eaton Metal is still in business. *See* http://www.eatonmetal.com (last visited July 12, 2014).

### c.     Other methods of execution

While Arizona has not used the firing squad or the electric chair as a method of execution, *see* ADC, Executions by Method, http://www.azcorrections.gov/Datasearch_ex-method.aspx (last visited July 12, 2014), brief discussion of these two methods is instructive. It further supports the fact that the manufacturers involved in the execution process have been historically open to the public, and also supports the concept that public must be informed to discuss the method and the death penalty.

Firing squads have been used as a method of execution in Utah and Nevada. Banner, *supra*, 203. Accounts of firing squad executions reflect that the types of guns, and thus the guns' manufacturers, were reported publicly. *See* Drimmer, *supra*, 105, 116 (noting that Winchester rifles were used when Utah executed Gary Gilmore in 1977 and recounting the use of M-1 rifles in a military execution).

---

http://news.google.com/newspapers?id=WQJaAAAAIBAJ&sjid=FUsNAAAAIBJ&pg=7086%2C3403577 (last visited July 12, 2014).

The first execution in an electric chair occurred in 1890. The method of execution was a matter of intense public debate. Numerous published accounts tell the story of Thomas Edison's battle with the Westinghouse Electric Company, which provided a backdrop to the introduction of the electric chair. Edison and Westinghouse had two competing approaches to delivering electricity, which was then a new technology. Westinghouse developed technology and equipment for delivering high-voltage alternating current (AC), while Edison developed and promoted low-voltage direct current (DC). AC electricity was delivered to electric chairs using Westinghouse products. *See generally* Mark Essig, Edison & the Electric Chair: A Story of Light and Death (Walker & Co. 2003); Drimmer, *supra*, 11-21; Driggs, *supra*, 1176-78; BANNER, *supra*, 181-83.

As electrocution spread as the predominant method of execution electricians developed expertise in operating electric chairs, and their assistance in conducting executions was often discussed in public accounts. Drimmer, *supra*, 5, 27-28. Edwin Davis, the electrician at the first electrocution, patented various components of the electric chair and went on to fame in conducting hundreds of executions. Banner, *supra*, 194-95; *see also id.* at 182 (recounting that the electric chair made Harold Brown, a protégé of Edison, "the most famous electrical engineer in the state" of New York); Driggs, *supra*, 1177. Despite Westinghouse's objections, its generators became part of the killing apparatus. Banner, *supra*, 183. As widely

29

reported in the press, Westinghouse then funded unsuccessful litigation challenging the constitutionality of the electric chair. *See id.* at 184-85.

The publicity surrounding the adoption of the electric chair as a method of execution led to extensive public scrutiny and debate of the method. Articles entitled "Far Worse Than Cruel" and "It Was Cruel," for example, followed the first execution at Auburn Prison in New York in 1890. Driggs, *supra*, 1178. George Westinghouse famously said that executions could be "done better with an ax." *Id.* The adoption of electrocution as a method of execution came about in the midst of extensive public debate, legislative inquiry, and media criticism. The public debate was informed in large part by details concerning the specific type of electricity and machinery to be used in making electric chairs. *See* Banner, *supra*, 178-85.[14]

---

[14] In the 1980s and 1990s, Fred A. Leuchter, dominated the market in designing and creating the electric chair. Deborah Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century*, 35 Wm. & Mary L. Rev. 551, 626 (1994). Leuchter was president of his Boston based company, and he created all types of lethal injection equipment including electric chairs and the component parts, as well as provided training for execution technicians. *Id.* According to Leuchter, he consulted with or provided equipment to twenty-seven states. *Id.* at 627. Leuchter was very open about his profession and his business, and he was featured in a number of news accounts. *Id.* at 626-27, nn. 494-496.

## 2. ADC's history related to information about lethal-injection drugs.

The State of Arizona now relies on lethal injection to carry out most of its executions.[15]  ADC has the sole authority for developing the lethal-injection protocol to be used in executing Arizona's condemned prisoners, and for carrying out that task.  Ariz. Rev. Stat. § 13-757(A).  The statute that grants ADC this authority also protects the identity of "executioners and other persons who participate or perform ancillary functions in an execution" from public disclosure (the "executioner-confidentiality" statute).  Ariz. Rev. Stat. § 13-757(C).

ADC has recently begun claiming that the executioner-confidentiality statute protects the identities of drug manufacturers and distributors.  It first raised that claim in 2010, when its lawful supply of drugs was no longer available.  At that point, ADC chose to look for unlawful foreign suppliers for its lethal-injection drugs; simultaneously, ADC claimed that Arizona's executioner-confidentiality statute protected the identity of the supplier.

### a.    ADC concealed information that related to its violation of federal law.

At some point in 2009 or 2010, the manufacturer of one of the three drugs that ADC used in its protocol developed manufacturing problems and was unable to produce sodium thiopental; these problems led to drug-acquisition difficulties

---

[15] For crimes committed before 1992, the prisoner is given the choice of execution by lethal gas or by lethal injection.  Ariz. Rev. Stat. § 13-757(B).

for ADC.[16]  These difficulties first came to light in September 2010, when a condemned Arizona prisoner asked ADC to provide him with information about the sodium thiopental ADC intended to use in his executions.[17]  Because no legitimate domestic source of sodium thiopental existed at the time, he believed that ADC intended to important sodium thiopental from a foreign source.[18]  He therefore explained that, *inter alia*, importing drugs was illegal.

In response to the prisoner's request, Defendants refused to provide the information, and instead cited Arizona's executioner-confidentiality statute as a basis for refusing to provide the information.  Defendants continued to make that assertion in response to subsequent requests made by other condemned prisoners, and repeatedly avowed that ADC had obtained the sodium thiopental lawfully.

As later events demonstrated, however, Defendants' avowals were incorrect. On May 24, 2011 (which was one day before the scheduled execution of Donald Beaty), the Drug Enforcement Administration (DEA) informed Defendants that—

---

[16] *See, e.g.*, Jesse Halladay, "Anesthesia shortage may delay executions," USA Today, Aug. 28, 2010 (noting that Hospira was experiencing manufacturing problems and did not expect the drug to be available until the first quarter of 2011), *available at* http://usatoday30.usatoday.com/news/nation/2010-08-28-lethal-injection-shortage_N.htm (last visited July 12, 2014).

[17] *See e.g.*, Compl., filed Oct. 21, 2010, *Landrigan v. Brewer*, No. 2:10-cv-02246-ROS (D. Ariz.) (Dist. Ct. ECF No. 1), ¶¶ 16-22.

[18] *Id.* ¶¶ 42-43.  Several months later, owing to requests made under the federal Freedom of Information Act, and under Arizona's public-records statute, other death-row prisoners obtained detailed information about ADC's imported supply of sodium thiopental (and other lethal-injection drugs not relevant here).

as death-row prisoners had warned—ADC had obtained its supply of sodium thiopental in violation of the federal Controlled Substances Act.[19]  ADC then gave the Arizona Supreme Court eighteen hours' notice that Defendants would execute Mr. Beaty with Nembutal,® the brand name of the only version of pentobarbital approved by the Food and Drug Administration (FDA).  That drug was not listed in ADC's written protocol.  The following month, after Mr. Beaty's execution with the new, unlisted drug, ADC changed its protocol to include pentobarbital in its list of accepted drugs.  (ADC's protocol now lists drug options of sodium thiopental; pentobarbital; and a two-drug protocol consisting of midazolam and hydromorphone.)[20]

---

[19]Although condemned prisoners pointed out to Director Ryan and to state and federal courts that the importation of the drugs likely violated various federal laws, ADC repeatedly avowed that it had complied with all laws when it acquired the drugs.  *See, e.g.*, Aff. of Charles L. Ryan, attached to State's Resp. to Mot. for Order Directing the State to Provide Information and to Abide by its Current Written Lethal Injection Protocol and Mem. in Support, *State v. Landrigan*, No. CR-90-0323-AP (Ariz. Sup. Ct.), filed Oct. 8, 2010 (Exs. to Mot., Ex. K, ER 056).  Aff. of Charles L. Ryan, Attach. A to State's Resp. to Supplemental Mem. on Mot. for Issuance of a Warrant of Execution, *State v. Cook*, No. CR-88-0301-AP (Ariz. Sup. Ct.) filed Dec. 28, 2010 (Exs. to Mot., Ex. H, ER 058).
    The drug importation also violated the federal Food, Drug, and Cosmetics Act (FDCA).  *Cook v. FDA*, 733 F.3d 1, 12 (D.C. Cir. 2013) (holding that the FDA violated the FDCA when it worked with state departments of corrections—including Arizona—to allow those states to import the drug).

[20] ADC Dep't Order 710 at Attach. D, section C, "Chemical Charts; Choice of Protocol," effective March 26, 2014, *available at* http://www.azcorrections.gov/Policies/700/0710.pdf (last visited July 13, 2014).

### b. Since 2010, ADC has released drug-related information of the type at issue here without claiming that confidentiality applied.

Despite ADC's rigid insistence on the applicability of the executioner-confidentiality statute to drug sources (a position about which then-Vice Chief Justice Andrew Hurwitz of the Arizona Supreme Court expressed doubt),[21] Defendants have at other times released precisely the type of information currently at issue in this case. During the course of litigation related to ADC's lethal-injection protocol, ADC turned over extensive information about its supply of Nembutal,® including photographs of the actual bottles of the drugs, and photographs of the box labels containing the lot numbers and expiration dates of the drug.[22] In that case, although the court had issued a protective order that covered certain information as defined in the executioner-confidentiality statute,[23] Defendants did not include the drug-related documents under that protective

---

[21] Oral Arg., *State v. Landrigan*, No. CR-90-0323-AP, Oct. 20, 2010, at 14:01-14:28 (noting that "surely" the statute only covered the participants in the execution—not the manufacturers), *available at* http://www.azcourts.gov/AZSupremeCourt/LiveArchivedVideo.aspx; select "2010" and then select *State v. Landrigan*, Oral Argument. (Last visited July 13, 2014).

[22] *See* (Exs. to Mot., Defs' Disclosures, Ex. J, ER 067-072).

[23] The protective order covered "information sufficient to determine 'the identity of executioners and other persons who participate or perform ancillary functions in an execution,' as that information is defined and protected under A.R.S. 13-704(c)." (Exs. to Reply, Protective Order, Ex. L, ER 060).

order.[24]    Instead, Defendants provided the detailed drug-specific information—of the same type requested here—in a non-protected format.  In other words, when Defendants had the opportunity to assert that this information was confidential under the statute, they did not.

Subsequently, two death-row prisoners who were scheduled to be executed in October 2013 asked ADC to provide them with information about the drugs ADC intended to use in their executions.   ADC refused, claiming that the information, including the same type of information Defendants provided in 2011, was protected under Arizona's executioner-confidentiality statute.  The prisoners then filed a civil-rights complaint and a related motion for preliminary injunction,[25] in which they alleged violations of their First Amendment right of access of government information related to executions—just as Mr. Wood has done here. The district court issued an initial order granting the motion for preliminary injunction and ordered ADC to divulge the manufacturer, National Drug Codes, lot numbers, and expiration dates for the lethal-injection drug.   Order, *Schad v. Brewer*, No. 2:13-cv-13-02001-ROS, at 2 (D. Ariz. Oct. 4, 2013), ECF No. 23.  In

---

[24] (Exs. to Mot., Notice, Ex. J, ER 065), (identifying Bates numbers of confidential documents, and Bates numbers of non-confidential document).  These photographs were not marked with Bates numbers identified as confidential; moreover, the documents were neither marked as confidential, nor ordered by the district court to be produced publically.

[25] Pls.' Mot. Prelim. Inj., *Schad v. Brewer*, No. 2:13-cv-02001-ROS (D. Ariz. filed October 3, 2013), ECF No. 11.

an expanded order, the court held that prisoners have a First Amendment right of access to government information related to their executions because executions have historically been open to the public, and because public access to information plays a significant positive role in the functioning of capital punishment. Order, *Schad v. Brewer*, No. 2:13-cv-13-02001-ROS, 2013 WL 5551668, at *4-5 (D. Ariz. Oct. 7, 2013). ADC did not appeal the Court's order; instead ADC released the information in a publically filed document.[26]

Thus, ADC's history shows that it has provided precisely the type of information at issue here.

> ### 3. The district court's conclusion that there is no authority to support the proposition that the requested information has historically been open to the press and general public is clearly erroneous.

The district court decided that because there was no case law to support a finding that historically, information regarding the products (here, drugs) used in executions, the process by which States have determined what amounts and types of products to use, and the background qualifications of the executioners, then there is no support for it. That was error for two reasons. First, as Mr. Wood argued to the district court and has asserted in Section I.A, this Court has already determined in *California First Amendment Coalition* that executions are

---

[26] Notice of Disclosure, *Schad v. Brewer*, No. 2:13-cv-13-02001-ROS (D. Ariz. Oct. 5, 2013), ECF No. 24.

historically open governmental proceedings. And, as discussed above, the type of information Mr. Wood's requests here has historically been available. The displaying of the ropes used in the 28 Arizona hangings at the Pinal County Historical Society is the modern-day equivalent of displaying the vials of drugs used in executions. The public discussion of the California Cyanide Company as the supplier of the lethal gas and Eaton Metal Products as the manufacturer of the Arizona gas chamber is the same as identifying the makers and distributors of the drugs used to carry out lethal injections.

Second, the district court need not have a factually identical case before it to determine that the facts here support the proposition of law identified by Mr. Wood. By failing to conduct the correct legal analysis, the district court abused its discretion.

> **C.    The district court's finding that the requested information was unnecessary in playing a significant positive role in the functioning of the particular proceeding in question was based on findings outside the record.**

As the Supreme Court has explained, another part of the analysis in determining whether the public has a right of access to particular governmental proceedings includes an assessment as to "whether public access plays a significant positive role in the functioning of the particular process in question." *Cal. First Amendment Coal.*, 299 F.3d at 875 (quoting *Press–Enter*.II, 478 U.S. at 8–9).

37

But in this case, the district court found without evidentiary support that the *currently* "available information is sufficient for an 'informed public debate.'" (Order at 12, ER 014.)  The court then determined—not only without evidentiary support, but also without assertion from Defendants—that the requested information was not useful for public debate, but served only to pressure drug suppliers to cease supplying the drugs.  (*Id.* at 13-14, ER 015-016.)  Not only was the district court wrong to base its decision on its own unsupported assertion, but the court drew the incorrect conclusion about its assertion.  That is, as discussed below, the court's assertion actually supports Mr. Wood's position that the requested information is directly relevant and critical to informed public discussion. Moreover, reaching these conclusions, the court went beyond the record and based its decision to deny the preliminary injunction on clearly erroneous findings of fact.

First, in rejecting the argument that this information is necessary for public debate about the death penalty, the district court made an unsupported finding that "[t]he real effect of requiring disclosure, however, is to extend the pressure on qualified suppliers not to supply the drugs, as has happened in the past."  (Order at 13-14, ER 015-016.)  There was no evidence presented that pressure was extended in such a manner that companies refused to provide drugs.  What is known, however—from the robust, constitutionally protected public discussion about the

38

lethal-drug issue—is that two drug companies whose products have been used for executions in the past have publically stated that they are distressed by the misuse of their lifesaving products.[27]  These two companies have accordingly chosen to prevent distribution of their products to departments of corrections.[28]  At least one of the companies appears to have been unaware of this use of its products in executions until public and media discussion led to the information.[29] After learning this information, the companies responded as they saw appropriate—as is

---

[27] Lundbeck Information Release, "Lundbeck overhauls pentobarbital distribution program to restrict misuse," July 1, 2011, *available at* http://investor.lundbeck.com/releasedetail.cfm?ReleaseID=605775 (last visited July 13, 2014) ("Lundbeck adamantly opposes the distressing misuse of our product in capital punishment.").  *See also* Hospira, "Hospira Position on Use of Our Products in Lethal Injections," undated, *available at* http://www.hospira.com/about_hospira/government_affairs/hospira_position_on_use_of_our_products/index  (last visited July 13, 2014) ("Hospira makes its products to enhance and save the lives of the patients we serve, and, therefore, we have always publicly objected to the use of any of our products in capital punishment.").

[28] Lundbeck Information Release, *supra* n.27 ("Lundbeck today announced that the company has moved to alter the distribution of its medicine Nembutal® (pentobarbital sodium injection, USP) in order to restrict its application as part of lethal injection in the U.S."); Hospira Position Statement, *supra* n.27 ("Consistent with our goal of providing our customers uninhibited access to our products while restricting distribution for unintended uses, Hospira has implemented a restricted distribution system under which Hospira and its distributors have ceased the direct sale to U.S. prison hospitals of products . . . that have been part of, or are being considered by, some states for their lethal injection protocols. *** Hospira offers these products because they save or improve lives, and markets them solely for use as indicated in the product labeling.").

[29] Lundbeck Information Release, *supra* n.27 ("Since learning about the misuse we have vetted a broad range of remedies—many suggested during ongoing dialogue with external experts, government officials, and human rights advocates.").

their right, and is to be expected in a society that prizes the marketplace of ideas and the free-market economy.  Thus, to the extent that any evidence may exist outside the record to support the district court's assertion that public discourse led to these companies' business decisions, that discussion is not only part of the constitutionally protected marketplace of ideas, but it is also part of the free market.

Relatedly, the district court also asserted that there is no legitimate significance in obtaining information regarding the drugs, stating that "extend[ing] the pressure on qualified suppliers not to support the drugs" has happened in the past.  (Order at 13-14, ER 015-016) (citing *Landrigan v. Brewer*, 625 F.3d 1132, 1143 (9th Cir. 2010) (Kozinski, C.J., dissenting from the denial of rehearing en banc)).  Ostensibly, the district court refers to Chief Judge Kozinksi's comment that "one journalist suggested the company might be criminally liable under an EU regulation that makes it illegal to 'trade in certain goods which could be used for capital punishment, torture, or other cruel, inhuman or degrading treatment.'" *Landrigan*, 625 F.3d at 1143 (citing Clive S. Smith, *The British Company Making a Business out of Killing,* The Guardian (Oct. 26, 2010, 4:00 p.m.), http:// www. guardian.co.uk/commentisfree/cifamerica/2010/oct/26/jeffrey-landrigan-execution-sodium-thiopental).

But rather than counsel against release of governmental information relating to the death penalty, Chief Judge Kozinski's commentary and citation of media articles appearing in the free press directly supports Mr. Wood's argument: information regarding the execution process contributes to the public debate about the death penalty.  It certainly is of particular significance to the public to know that the State that is carrying out its execution process is doing so through unlawful means.[30]  (And, of course, the district court cannot predict what other aspects of

---

[30] Recently, there has been a robust and continuing public debate about the drugs used to carry out lethal injections.  *See generally* Editorial, *Lethal Injection and the F.D.A.*, N.Y. Times (Jan. 27, 2011), http://www.nytimes.com/2011/01/28/opinion/28fri3.html (last visited July 13, 2014); Editorial, *Demise of a death drug*, L.A. Times (Jan. 27, 2011), http://articles.latimes.com/2011/jan/27/opinion/la-ed-deathdrug-20110127 (last visited July 13, 2014); Andrew Marra, Editorial, *Free-market stay of execution as manufacturer stops making drug used in lethal injections*, Palm Beach Post (Jan. 27, 2011, 6:39 PM), http://www.palmbeachpost.com/news/news/opinion/free-market-stay-of-execution-as-manufacturer-stop/nLpdf/ (last visited July 13, 2014) ("Imagine if America's death penalty, a costly and flawed enterprise, were strangled not by critics arguing moral outrage but by the impassive forces of globalized capitalism."); Editorial, *The Broken Machinery of Death*, N.Y. Times (Mar. 18, 2011), http://www.nytimes.com/2011/03/19/opinion/19sat3.html (last visited July 13, 2014); Editorial, *In pending Oklahoma executions, no debate over condemned men's guilt*, The Oklahoman (April 29, 2014), http://newsok.com/in-pending-oklahoma-executions-no-debate-over-condemned-mens-guilt/article/4569094 (last visited July 13, 2014) ("If the drug supply dries up, the state would be forced to consider changing to the electric chair or firing squad — or perhaps join the growing number of states that have taken the death penalty off the books."); Andrew Cohen, *The Secrecy Behind the Drugs Used to Carry Out the Death Penalty*, The Atlantic (Jan. 25, 2013, 1:06 PM), http://www.theatlantic.com/national/archive/2014/01/the-secrecy-behind-the-drugs-used-to-carry-out-the-death-penalty/283348/ (last visited July 13, 2014); Editorial, *Our View: Secret drug*, Joplin Globe (Jan. 31, 2014),

discussion might arise in the public sphere as a result of the release of this information. That is for the marketplace of ideas to decide.)

Thus, the district court's unsupported conclusion that the information that Mr. Wood requests would not "[p]lay a significant positive role in the functioning of the death penalty" (Order at 12, ER 014), and that "[t]he usefulness of the identity of the manufacturer to public debate on the death penalty is attenuated[,]" (Order at 13, ER 015), is not only factually incorrect, but the true state of affairs also proves Mr. Wood's First Amendment claim.

Second, the district court found that the State would be "impeded" from obtaining execution drugs from a legal source if disclosure of that source were required. (Order at 14, ER 016.) Much like the court's unsupported finding about the public value of the information, there was no evidence presented to support this finding. In fact, when the court suggested that Mr. Wood conceded that he wanted

---

http://www.joplinglobe.com/editorial/x748030247/Our-View-Secret-drug (last visited July 13, 2014) ("But there is a discussion that needs to take place about the death penalty, and that's whether Missourians are OK with the secrecy that now surrounds the drug being used to carry it out."); Editorial, *Justice is back on schedule*, Amarillo Globe-News (April 25, 2014, 6:33 PM), http://amarillo.com/opinion/editorial/2014-04-25/editorial-justice-back-schedule (last visited July 13, 2014) ("Yet another legal end-around by capital punishment opponents has failed, at least for now."); Editorial, *Our View: Death penalty lowers us to the level of vile criminals*, Arizona Republic (May 3, 2014, 4:32 PM), http://www.azcentral.com/story/opinion/editorial/2014/05/03/end-executions-now/8631405/ (last visited July 13, 2014) ("Reliably deadly drugs are no longer available. States are improvising, using untested combinations cobbled together from who knows where.").

"to get the identity of the supplier so that pressure can be brought on them so that they will stop supplying this" (Hr'g Tr., at 12:1-3, ER 029), counsel explained that the court "misunderstood." (*Id.* at 12: 5-6, ER 029.) Rather, counsel unequivocally stated, "I just want to be clear we are not seeking information today to dry up the drug sources." (*Id.* at 33:25-34:1, ER 050-051.) Therefore, the district court's finding that the State would be "impeded" from obtaining drugs if the source were disclosed is clearly erroneous and unsupported by the record.

Finally, on the matter of Mr. Wood's request for information detailing the legal and professional qualifications of the individuals who intend to participate in Mr. Wood's execution, the district court found that "the detail of information Wood requests might in fact become 'identifying' information.'"[31] (Order at 14, ER 016.) As with the court's findings about the value of the drug-related information, the court made its finding without evidence, and without argument by Defendants. Moreover, the court admitted that was "only a possibility on this sparse record." (*Id.*) It nevertheless held that "the possibility alone weighs against disclosure when nothing specific weighs in favor." (*Id.*)

The district court's findings were clearly erroneous. As an initial matter, an unsupported, unargued mere possibility cannot serve to defeat Mr. Wood's claim. But equally important is the fact that information about the qualifications of the

---

[31] Mr. Wood stresses that his request for proof of legal and professional qualifications does not include a request for personally-identifying information.

persons who will execute him—in the name of Arizona's citizens—is a matter that is squarely within the sphere of "informed public debate."

For example, in April, Oklahoma attempted to execute Clayton Lockett, using a femoral-vein catheter (the same venous-access method that ADC frequently uses in Arizona).[32]  Early reports from the director of Oklahoma's Department of Corrections, as well as from a private autopsy, indicate that the femoral-vein catheter was not properly set, and as a result, the drugs failed to properly enter Mr. Lockett's bloodstream.  Mr. Lockett died—not as a result of the intended execution drugs, but rather from a heart attack that occurred many minutes after the catheter failed.[33]  This event, and the cause for it, has generated significant public discussion.

Because the district court's findings were, in part, the basis for denial of Mr. Wood's preliminary injunction, they cannot stand, and they provide further support for this Court to reverse the district court's denial of injunctive relief.

---

[32] *See, e.g.*, Rick Green & Graham Lee Brewer, *Botched lethal injection in Oklahoma: Independent autopsy finds IV was not set properly*, The Oklahoman, June 13, 2014, *available at* http://newsok.com/botched-lethal-injection-in-oklahoma-independent-autopsy-finds-iv-was-not-set-properly/article/4907545 (last visited July 12, 2014).

[33] *See also West v. Brewer*, No. CV–11–1409–PHX–NVW, 2011 WL 6724628 (D.Ariz. Dec. 21, 2011), at *6 (finding multiple problems with the qualifications of some of ADC's execution team, including the fact that ADC relied on one medical team member who did not hold a medical license, and that one member had been charged with a DUI, and had been arrested for consuming liquor in public, and for writing a bad check).

> **D. The district court's reliance on non-binding precedent compounded its error in determining that there was no likelihood of success on Mr. Wood's First Amendment claim.**

In finding that there is no First Amendment right to access records regarding the execution process in Arizona, the district court reached a conclusion that was at odds with a district-court decision last year involving a nearly identical issue. *See Schad v. Brewer*, No. 13-cv-2001-PHX, 2013 WL 5551668 (D. Ariz. Oct. 7, 2013) (unpublished order). As *Schad* held, "the public must have reliable information about the lethal injection drugs themselves in order to judge the propriety of the particular means used to carry out an execution." *Schad*, 2013 WL 5551668, at *5. But the district court in this case disagreed. The only legal support[34] that the district court cited in its rejection of the analysis in *Schad* are two cases brought by Georgia death-row prisoners that have addressed the First Amendment in the execution context, which the district court noted were decided after *Schad*. (Order

---

[34] As a final point in its analysis that reached a different conclusion than *Schad*, the district court noted that the record in that case involved "significant questions about the reliability of the information disclosed by the Arizona Department of Corrections" and noting concerns of expired or foreign drugs. (Order at 12-13, ER 014-015) (citing *Schad*, 2013 WL 5551668, at *2). But in *Schad*, just as in the instant case, ADC had provided a statement that "ADC intends to use unexpired, domestically obtained" drugs in the scheduled executions. 2013 WL 5551668, at *1. *See* Exs. to Reply, Ex. M, ER 178 (letter from Director Ryan stating that the drugs that will be used in the event of an execution "have been domestically obtained and are FDA approved"). Again, the proper First Amendment inquiry under *Press-Enterprise II* is whether access to the information "plays a significant positive role in the functioning of the particular process." 478 U.S. at 8 (citing *Globe Newspaper*, 457 U.S., at 606).

at 10-11, ER 012-013.)  One opinion was issued by the Georgia Supreme Court, *Owens v. Hill*, 2014 WL 2025129 (Ga. May 19, 2014), and the other by the Eleventh Circuit Court of Appeals, *Wellons v. Comm'r, Ga. Dep't of Corr.*, 2014 WL 2748316 (11th Cir. June 17, 2014).  Besides being non-binding authority and involving different state law, neither of these cases offers persuasive reasoning that this Court should follow.

In *Owens v. Hill*, the Georgia Supreme Court determined that the prisoner's First Amendment right of access was not violated by the State's failure to provide information about the execution drugs.[35]  In rejecting that claim, the court first explained that not all government documents are accessible to the public, relying on three cases—two of which the district court in this case cited in the beginning of its First Amendment discussion.  *Hill*, 2014 WL 2025129, at *9 (citing *Florida Star v. B.J.F.*, 491 U.S. 524, 534 (1989); *McBurney v. Young*, 133 S. Ct. 1709, 1718 (2013); *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978)).  These cases simply affirm that there is no general constitutional right of access to *all* government information, or *all* information provided by FOIA laws.  *See Cal-Almond, Inc. v.*

---

[35] Georgia's state statute, which is much more restrictive than Arizona's, makes confidential and prevents disclosure (even under judicial process) of the "identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence. . . ." *Hill*, 2014 WL 2025129, at *1, n.2 (citing OCGA § 42-5-36(d) (amended eff. July 1, 2013)).

46

*U.S. Dep't of Agric.*, 960 F.2d 105, 109 n.2 (9th Cir. 1992) (Although *Houchins*

"recognize[s] that there is no *general* right of access to government information, . .

. the line of cases from *Richmond Newspapers* to *Press–Enterprise II* recognizes

that there is a *limited* constitutional right to *some* government information.").  Mr.

Wood does not dispute this, and he has not asserted a general constitutional right to

*all* government information.  But, as he explained in Section I.A. *supra*, under

*Richmond Newspapers* and subsequent cases, the First Amendment does establish

a public right of access to *some* governmental proceedings and records.

     The Georgia Supreme Court then determined that there was no First

Amendment right of access to information about execution drugs under the two-

prong analysis in *Press-Enterprise*.  That court's analysis is unpersuasive, and

inapplicable here, for several reasons.  First, relying upon a quotation from this

Court's decision in *California First Amendment Coalition* and a quotation from a

law-review note authored by a student, it determined that access had not been

granted historically because "there has been a longstanding tradition of concealing

the identities of those who carry out executions." *Hill*, 2014 WL 2025129, at *10.

The *California First Amendment Coalition* quotation upon which *Hill* relies

indicates that there has been "limited public access to executions."  *Id.* (citing *Cal.

First Amendment Coal.*, 299 F.3d at 876).  What the Georgia Supreme Court failed

to  address,  however,  is  the  context  in  which  this  Court  when  it  made  that

47

statement: it was discussing the fact that the prison limited the number of witnesses who could attend executions, and determined that the fact "[t]hat only select members of the public attend does not erode the public nature of executions." *Cal. First Amendment Coal.*, 299 F.3d at 876.  This Court's binding precedent, rather than a state court's misapplication of the case, should be followed.

Moreover, the quote upon which *Hill* relies from the student note cites a source that actually suggests that executioner identities were not consistently hidden and instead supports the historical openness of executions: "The *only* thing that was *sometimes* kept secret at early American executions was the executioner's identity." Ellyde Roko, Note, *Executioner Identities: Toward Recognizing a Right to Know Who is Hiding Beneath the Hood*, 75 Fordham L. Rev. 2791, 2796 n.38 (2007) (citing John D. Bessler, Death in the Dark: Midnight Executions in America 25 (1997)) (emphasis added).[36]  In reaching its conclusion regarding access to information about the drugs, the *Hill* court provides neither factual support nor evidence from the record in that case.  Given the sparse support for the sweeping conclusion of the Georgia Supreme Court, the district court erred in relying upon it.

---

[36] Moreover, the law-review article is irrelevant here, as it argues the need for the specific identity of the individual persons participating in executions.  Roko, *supra*, at 2795 (suggesting that recent examples of execution team members who were unqualified "highlight concerns over whether states should be allowed to keep executioner identities confidential").

As to the second part of the *Press-Enterprise* test—whether "public access plays a significant positive role in the functioning of the particular process in question" 478 U.S. at 8—the *Hill* court recognized that disclosing the information might enhance both the debate about the death penalty and about whether the procedures are humane. *Hill*, 2014 WL 2025129, at *10. Nevertheless, it determined that "Georgia's execution process is likely made more timely and orderly by the execution-participant confidentiality statute and, furthermore, that significant personal interests are also protected by it." *Id.* If those concerns are, in fact, sufficient to override the constitutional rights of the public (which Mr. Wood does not concede), the record before this Court offers no support of those reasons. *See* Section I.C., *supra* (discussing the district court's erroneous finding of facts).

*Wellons* provides no more support for the district court's conclusion than *Hill*. In *Wellons*, the Eleventh Circuit rejected the prisoner's claim that the First Amendment provides him with a right of access to information about the drugs used in executions. In denying the claim, the court provided no analysis supporting its conclusion that the First Amendment does not permit the right of *individual* access in executions. And the conclusion it reached is inconsistent with Supreme Court law. *Wellons* referenced the district court's order, stating that the lower court determined "that while there may be First Amendment implications involved in the openness of government operations, the cases that Plaintiff relies

49

on turn on the public's – rather than an individual's – need to be informed so as to foster debate."  2014 WL 2748316, at \*6.  This distinction is inconsistent with Supreme Court precedent.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) (noting that a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system"); *Globe Newspaper Co.*, 457 U.S. at 604 (explaining that the purpose of the First Amendment's right of access is "to ensure that *the individual citizen* can effectively participate in and contribute to our republican system of self-government") (emphasis added).

Even if this conclusion were not at odds with Supreme Court law, *Wellons* is inapplicable here.  Mr. Wood has consistently asserted that he is an "'individual citizen' with a First Amendment right of access to governmental proceedings" and that, as a prisoner, he retains First Amendment rights absent procedures to deprive him of those rights, which has not occurred here.  (Mot. at 11) (citing *Pell*, 417 U.S. at 822; *see also* Reply at 2).  Defendants did not contest Mr. Wood's assertion, nor did the district court make a finding that Mr. Wood was not entitled to First Amendment rights.  Therefore, the decision in *Wellons* offers no persuasive authority for this Court.  The district court's reliance on inapplicable law—while ignoring the relevant precedent as explained *supra* in Section I.A.—resulted in an abuse of discretion.

50

## II.    Mr. Wood meets the other requirements for a preliminary injunction

For the reasons outlined *supra* in Section I.A., Mr. Wood can demonstrate a likelihood of success on the merits of his claim.  Because the district court decided that Mr. Wood could not show a likelihood of success on the merits of his First Amendment claim, it did not consider the other factors necessary in deciding whether to grant a preliminary injunction.  *See Lopez*, 680 F.3d at 1072  (plaintiff must show (1) that he will likely succeed on the merits of his claim; (2) that without relief, he will likely suffer irreparable harm; (3) that "the balance of equities tips in his favor"; and (4) that "an injunction is in the public interest") (citations omitted).   The other three factors weigh in Mr. Wood's favor for obtaining a preliminary injunction.

### A.    If Mr. Wood is executed without injunctive relief, he will suffer irreparable harm

Mr. Wood will suffer irreparable harm if he executed without intervention of this Court because he will be deprived of his First Amendment right to be informed about how the State intends to execute him.  *See Towery v. Brewer*, 672 F.3d 650, 661 (9th Cir. 2012) (recognizing that irreparable harm is demonstrated by prisoners bringing § 1983 lawsuit involving upcoming execution).   As this Court recently reiterated, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Otter*,

682 F.3d at 826 (citation omitted).  Moreover, this Court has made clear that "[a]n alleged constitutional infringement will often alone constitute irreparable harm."  *Goldie's Bookstore Inc. v. Super. Ct. of Calif.*, 739 F.2d 466, 472 (9th Cir. 1984); *see also, e.g.*, *Warsoldier v. Woodford*, 418 F.3d 989, 1001-1002 (9th Cir. 2005) ("'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary'") (citation omitted).  Here, Mr. Wood can demonstrate that his First Amendment rights are being violated, and that if the violation is not remedied before his execution, he will suffer irreparable harm.

### B.    The balance of equities tips in Mr. Wood's favor

The balance of equities tips in Mr. Wood's favor.  Mr. Wood is not seeking an injunction to forever prevent the State from carrying out his sentence.  Rather, he seeks only to enjoin ADC from executing him in an unconstitutional manner.  A delay in his execution, if any, must be balanced by the fact that ADC has trampled upon his constitutional rights.

### C.    The public interest weighs in favor of issuing an injunction

Finally, this case weighs in favor of an injunction because the public interest is implicated.  "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."  *Otter*, 682 F.3d at 826 (quoting *Sammartano v. First*

52

*Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)).  Moreover, there is no public interest that would be injured by the granting of preliminary relief.  *Alliance for the Wild Rockies*, 632 F.3d at 1138 (considering "whether there exists some critical public interest that would be injured by the grant of preliminary relief").

### III.    Mr. Wood has not been dilatory.

Before granting injunctive relief that would prevent an execution from occurring, this Court must "consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim."  *Nelson v. Campbell*, 541 U.S. 637, 649 (2004).  There has been no such delay here.

Generally, as ADC's lethal-injection protocol indicates (Attach. D at § C(1), ER 101), the cause of action addressed here will not become ripe until ADC provides the official notice of the drug protocol that ADC will use in the execution. Nevertheless, in the interests of obtaining information (and potentially litigating relevant issues) as soon as possible, Mr. Wood began asking for this and related information within a few days of the State's request for a warrant of execution. After the limited response from ADC, Mr. Wood repeated his requests.  Finally, when ADC's letter of June 6, 2014, suggested that further requests for information and clarification would be futile, Mr. Wood and five other plaintiffs filed the Complaint in this matter on June 26, 2014.  Mr. Wood then waited for ADC to

provide the required twenty-day notice, in order to have official, and ostensibly final, information about Defendants' plans to execute him.  Counsel for Mr. Wood received that notice on Saturday, June 28, 2014.  After reviewing the letter, Mr. Wood filed this motion on the third business day after his counsel received the letter.  Mr. Wood filed his motion as soon as practicable after he received the limited information and official notice.[37]   Because Mr. Wood has not caused unnecessary delay, injunctive relief is appropriate.

## CONCLUSION

For the reasons stated herein, Mr. Wood respectfully requests that this Court reverse the decision of the district court and grant injunctive relief.

Respectfully submitted:                    July 14, 2014.

> Jon M. Sands
> Federal Public Defender
> District of Arizona
>
> Dale A. Baich
> Robin C. Konrad
>
> s/Dale A. Baich
> Attorneys for Plaintiff-Appellant

---

[37] The district court observed during argument that:

> Court:       . . .you are explicitly telling them, you are keeping it open as to what drugs you are going to use.  And they didn't know until . . . June 28.
>
> ***
>
> Court:       You made clear you weren't going to give them that.

(Hr'g Tr. at 24:16-24, ER 041.)

## STATEMENT OF RELATED CASES

I certify that there are no cases pending before this Court that are related to this case within the meaning of 9th Cir. R. 28-2.6.

<u>s/Dale A. Baich</u>
Attorney for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 13,335 words, excluding the parts exempt under Fed. R. App. P. 32(a)(7)(B)(iii). It was prepared in a proportionately spaced typeface (Times New Roman, a Windows system font) of size 14 points using Word 2010.

s/Dale A. Baich<br>
Attorney for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I certify that on July 14, 2014, I transmitted the foregoing Opening Brief using the Appellate CM/ECF system for filing and transmittal of a Notice of Docket Activity to the following ECF registrants:

Clerk of Court
James R. Browning U.S. Courthouse
95 7th Street
San Francisco, California 94103

Jeffrey A. Zick
Assistant Attorney General
1275 West Washington Street
Phoenix, AZ 85007

I further certify that on July 14, 2014, I sent the Excerpts of Record, in two volumes, to the following individuals in the number indicated and in the manner indicated:

Original and four copies:          Clerk of Court
                                   95 7th Street
                                   San Francisco, California 94103

One copy:                          Jeffrey A. Zick
                                   Assistant Attorney General
                                   1275 West Washington Street
                                   Phoenix, AZ 85007


s/Chelsea Hanson
Legal Assistant
Capital Habeas Unit