FILED

**FOR PUBLICATION**

JUL 19 2014

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSEPH RUDOLPH WOOD, III, | No. 14-16310 |
| Plaintiff - Appellant, | D.C. No. 2:14-cv-01447-NVW-JFM |
| v. | |
| CHARLES L. RYAN, Director of the Arizona Department of Corrections; RON CREDIO, Warden, ASPC-Eyman; LANCE R. HETMER, Warden, ASPC-Florence; UNKNOWN PARTIES, named as: John Does - unknown ADC Personnel, in their official capacities as Employees, Contractors, and/or Agents of the Arizona Department of Corrections, | OPINION |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted July 18, 2014
San Francisco, California

Before: THOMAS, GOULD, and BYBEE, Circuit Judges.

Opinion by Judge Sidney R. Thomas

THOMAS, Circuit Judge:

Joseph Wood ("Wood") is scheduled to die by lethal injection on July 23, 2014.  Wood seeks information from the Arizona Department of Corrections ("Department") regarding the method of his execution, which the Department has not provided.  Wood argues that, by withholding this information, the Department has violated his First Amendment rights.  He seeks a preliminary injunction delaying his execution until he receives the information.  The district court denied Wood's motion.  Although we do not reach the ultimate merits of the case, we conclude that Wood has presented serious questions going to the merits of his claim, and that the balance of hardships tips sharply in his favor.  We therefore reverse the district court's denial of the motion for a preliminary injunction.

I

A

Wood was convicted and sentenced to death for the 1989 murders of his estranged girlfriend, Debra Dietz, and her father, Eugene Dietz.  His conviction and sentence were affirmed on direct appeal by the Arizona Supreme Court.  *State v. Wood*, 881 P.2d 1158, 1177 (Ariz. 1994).  The United States Supreme Court denied Wood's Petition for a Writ of Certiorari.  *Wood v. Arizona*, 515 U.S. 1147 (1995).  In 1996, Wood filed a state petition for post-conviction review.  The state post-conviction court and the Arizona Supreme Court denied relief.  In 2002,

Wood filed a second post-conviction relief petition. The state post-conviction court and Arizona Supreme Court again denied relief. The federal district court denied his petition for a writ of habeas corpus. We affirmed the denial of his habeas petition. *Wood v. Ryan*, 693 F.3d 1104, 1122 (9th Cir. 2012).

On April 22, 2014, the Arizona Attorney General filed a motion seeking a Warrant of Execution. The Arizona Supreme Court granted the motion on May 28, 2014, setting Wood's execution date for July 23, 2014.

On April 22, the same day the State filed a motion seeking a warrant of execution, its Attorney General's office sent Wood's attorney, Julie Hall, a letter informing her that if the warrant was granted, the Department would use two drugs—Midazolam and Hydromorphone—to execute Wood. The State also indicated that if the Department could procure the drug Pentobarbital, it would "provide notice of its intent to use that drug."

On April 30, the head of Arizona's Federal Public Defender's Capital Habeas Unit, Dale Baich, sent the Department the first of four letters inquiring about the method the Department would use to execute Wood. He asked first about the two-drug protocol, inquiring about how the Department chose the amounts to be used of both drugs, the name and manufacturer of both drugs, the source of the drugs, and the credentials of those who would administer them. He

3

requested similar information concerning the Pentobarbital protocol and also asked how long the Department would plan to look for that drug.

The Department responded on May 6, indicating that it would use the new two-drug protocol on Wood if the warrant were granted, and that it had chosen the amounts of both drugs based on declarations and sworn testimony in "the Ohio Execution Protocol litigation."  It also indicated that the drugs would be domestically obtained and FDA-approved, although it would not release other identifying information, citing Arizona's confidentiality law, Ariz. Rev. Stat. § 13-757.  It noted that the qualifications of the IV team had not changed since the Department updated its protocol in 2012 to "include assurances of the" team's qualifications.  Finally, the Department added that it will "continue to look for a source of pentobarbital indefinitely."

Baich responded on May 9.  He again requested the drug manufacturer information, along with lot numbers and expiration dates for the two drugs.  He also asked for copies of the actual documents in the Ohio litigation upon which the Department relied in devising its new protocol.  Baich asked for clarification of the Department's claims that it would use the new two-drug protocol, but also continue to search for Pentobarbital.  Finally, given the recent problematic execution in Oklahoma and past criticism of the Department by the district court in Arizona,

4

Baich asked for the qualifications of the medical professionals who would perform the execution.

Baich followed up on May 15, forecasting the current litigation and directing the Department to preserve all electronically stored information and other documentation that pertains to the questions Baich had asked. He sent a second letter on that date, reiterating the questions from his previous letters and asking for documents from the Department in a variety of areas pertaining to his questions.

The Department responded on June 6, providing certain redacted records in response to Baich's request. These records include redacted purchase orders, invoices, and order confirmations for Midazolam and Hydromorphone. Although information about the manufacturers and suppliers was redacted, the documents do display the expiration dates of the Midazolam and Hydromorphone: September and October 2015. The Department refused to answer Wood's remaining requests and also referred him again to the State's execution protocol and the Ohio Execution Protocol litigation. In a June 25, 2014 letter, the Department provided final confirmation that Wood would be executed using the two-drug protocol, consisting of Midazolam and Hydromorphone. Following this correspondence, Wood still seeks: (1) the source(s), manufacturer(s), National Drug Codes ("NDCs"), and lot numbers of the drugs the Department intends to use in his execution; (2) non-

5

personally identifying information detailing the qualifications of the personnel the Department will use in his execution; and (3) information and documents explaining how the Department developed its current lethal-injection drug protocol.

B

On June 26, 2014, Wood and five other capital prisoners ("Wood" or "Plaintiffs") filed a 42 U.S.C. § 1983 complaint in the District of Arizona, seeking equitable, injunctive, and declaratory relief.  In the complaint, the Plaintiffs argue the Department has not provided sufficient information in response to requests by the Federal Defender and alleges three counts: that by deliberately concealing lethal injection information, the Department has violated Plaintiffs' (1) First Amendment right to petition the government for redress of grievances and (2) First Amendment right to be informed about the manner in which Arizona implements the death penalty; and (3) that Arizona's protocol, developed without complying with the Food, Drug and Cosmetics Act, violates the Supremacy Clause of Article VI of the Constitution.

On July 2, Wood filed a motion for a preliminary injunction or temporary restraining order.  Wood argued the district court should grant an injunction preventing the Department from carrying out his execution until it provides him

with the information he requests.  In a July 10 order, the district court denied

Wood's preliminary injunction motion.  The court concluded that the

motion—founded on Wood's second First Amendment claim—was unlikely to

succeed on the merits and that Wood had failed to present "serious questions"

going to the claim's merits.  *See Developmental Servs. Network v. Douglas*, 666

F.3d 540, 544 (9th Cir. 2011) ("Nevertheless, if a plaintiff fails to show that he has

some chance on the merits, that ends the matter.").  Wood filed a timely notice of

appeal on July 10.  We have jurisdiction under 28 U.S.C. § 1292(a)(1).

II

A

Wood appeals the district court's denial of his preliminary injunction

motion.  We review the "denial of a preliminary injunction for abuse of

discretion."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th

Cir. 2011).

To obtain a preliminary injunction on his First Amendment claim, Wood

"must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities

tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural

Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  We also recognize a variation on

7

the *Winter* test—the "serious questions" version—which requires the plaintiff to demonstrate that "'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1135). The plaintiff must still establish the other *Winter* factors as well. *Id.* "This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* The "serious questions" version does not require a "separate and independent analysis from the court's assessment of [Wood's] likelihood of success on the merits." *Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012). There are special considerations in a capital case when a plaintiff requests a stay of execution. "'[F]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course.'" *Towery*, 672 F.3d at 657 (quoting *Hill v. McDonough*, 547 U.S. 573, 583–84 (2006)). "Rather, 'a stay of execution is an equitable remedy' and 'equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts.'" *Id.* (quoting *Hill*, 547 U.S. at 584).

B

8

The district court concluded that Wood was unlikely "to show that he has some chance on the merits" of his First Amendment claim, and therefore denied the motion. *Developmental Servs. Network*, 666 F.3d at 544. In the claim at issue, Wood argues that the Department is violating his "First Amendment right of access to execution-related governmental information." To prevail at the preliminary injunction stage, Wood[1] must raise serious questions going to the merits of his First Amendment claim: (1) that this case is actually the type of case to which our right of access analysis properly applies; and (2) that the First Amendment right of access attaches to the execution-related governmental information he seeks. *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 873–77 (9th Cir. 2002). We address each question in turn.

1

The Supreme Court has recognized "that the First Amendment guarantees the public—and the press—a qualified right of access to governmental

---

[1] Wood and his co-plaintiffs sue to enforce a public First Amendment right. They may sue to enforce that right as individual citizens. *Cf. Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (stating that the First Amendment protections in cases involving the right of access to governmental proceedings ensures "that *the individual citizen* can effectively participate in and contribute to our republican system of self-government" (emphasis added)); *see also Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").

9

proceedings." *Cal. First Amendment Coal.*, 299 F.3d at 873. Underlying this right "is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" *Globe Newspaper Co.*, 457 U.S. at 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). This protection ensures "that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Id.* The Supreme Court has recognized a qualified right of access to criminal trials, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579–80 (1980), the testimony of child victims of sex offenses, *Globe Newspaper Co.*, 457 U.S. at 603–11, voir dire, *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 505–11 (1984), and preliminary hearings, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10–13 (1986) ("*Press-Enterprise II*").

Applying the two-factor analysis described in *Press-Enterprise II*, we recognized in *California First Amendment Coalition "*that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." 299 F.3d at 877. In acknowledging this right, we noted that "[t]o determine whether lethal injection executions are fairly and humanely

10

administered, or whether they ever can be, citizens must have reliable *information* about the 'initial procedures,' which are invasive, possibly painful and may give rise to serious complications." *Id.* at 876 (emphasis added).

Since *Richmond Newspapers, Inc.*, we have recognized not just a right of access to certain court proceedings, but also to documents related to those proceedings in which we found a right of access. *Oregonian Publ'g Co. v. United States Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) ("Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents.").

For example, in *Oregonian Publishing Co.*, we recognized a qualified right of access not just to "plea agreements," but to "related documents." *Id.* at 1465–66. The "related documents" in that case included the memorandum by the defendant supporting his motion to seal the plea agreement and the district court's findings in support of its order to seal. *Id.* at 1463–64. In *Seattle Times Co. v. United States Dist. Court*, 845 F.2d 1513, 1514–17 (9th Cir. 1988), we also recognized a qualified right of access to pretrial release proceedings and related documents, including financial affidavits filed in support of a motion for court-appointed counsel and briefs filed regarding preliminary detention. Similarly, in *CBS, Inc. v. United States Dist. Court*, 765 F.2d 823, 824-26 (9th Cir. 1985), we

11

acknowledged a qualified right of access to post-trial documents, including a
motion to reduce a criminal sentence and the prosecution's response. *See also id.*
at 825 (stating the "presumption that the public and the press have a right of access
to criminal proceedings and documents filed therein"). In *Phoenix Newspapers,
Inc. v. United States Dist. Court*, 156 F.3d 940, 946–49 (9th Cir. 1998), we
recognized a qualified right of access to transcripts of closed post-trial
proceedings. Finally, we recently acknowledged the First Amendment right of
access "to civil proceedings and associated records and documents." *Courthouse
News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014).

In short, the right to access to documents intrinsically associated with public
proceedings forms an important component of the *Press-Enterprise II* First
Amendment right of access. To be sure, the First Amendment does not generally
grant "a right of access to government information or sources of information
within the government's control," *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978).
Relying on this general principle, Arizona argues that the information Wood seeks
cannot be subjected to the *Press-Enterprise II* right of access analysis. But this
straw man argument begs the question. The issue is not whether *Press-Enterprise
II* grants a generalized right of access to executive branch documents. It does not.
Rather, the question is whether, consistent with our precedents, the documents

12

sought in this case are so intrinsically intertwined with a recognized right that disclosure is required.

In *California Free Amendment Coalition*, we recognized a right to view the entire execution, including those initial procedures "inextricably intertwined" with the process of putting an inmate to death. 299 F.3d at 877. And in that case, we explicitly stated the focus and scope of that right: providing citizens with "reliable information" about the execution's initial procedures, "which are invasive, possibly painful and may give rise to serious complications." 299 F.3d at 876. Here, like the memoranda, factual findings, affidavits, and transcripts recognized in other cases, Wood seeks access to documents—information regarding the drugs that will be used to execute him, the qualifications of the execution team, and the documents and evidence the State relied on in adopting its new execution protocol—that are related to, and arguably necessary for a full understanding of, a proceeding in which we have already granted a qualified right of access. This information is "inextricably intertwined" with the process of putting Wood to

death.  As a result, the *Press-Enterprise II* analysis applies as to the information

Wood seeks.[2]

2

Under the *Press-Enterprise II* First Amendment test, two "'complementary

considerations'" inform the analysis: "(1) 'whether the place and process have

historically been open to the press and general public[  ]' and (2) 'whether public

access plays a significant positive role in the functioning of the particular process

---

[2] The dissent argues that our First Amendment right of access analysis only
applies to formally filed documents "that transcribe or memorialize official
proceedings."  But the proceeding at issue, an execution, is different than all of the
other proceedings in which we have recognized a qualified right of access.
Executions do not involve the same type of formal dockets or filed documents as
criminal trials, or pretrial and post-trial proceedings.  Moreover, our holding in
*California First Amendment Coalition* recognized a right of access to executions
and clarified that the right seeks to give citizens "reliable information" about the
initial procedures involved in an execution, including the process of administering
lethal drugs.  299 F.3d at 876.  The information Wood seeks is closely tied to the
underlying proceeding.  And the informed citizenry we described is critical to the
successful functioning of the death penalty, unlike in a case like *Jury Service
Resource Center v. Muniz*.  When the nonprofit organization in that case sought
access to jury pool records, the court explicitly acknowledged that the jury pool
selection process is removed from the public trial and that "public access plays no
significant role in the . . . function of collecting and winnowing names for jury
lists."  134 P.3d 948, 954 (Or. 2006).  Given the unique nature of an execution, and
keeping in mind the boundaries of our holding and reasoning in *California First
Amendment Coalition*, we apply *Press-Enterprise II* to the information Wood seeks
without announcing the expansive new rule the dissent describes.

14

in question.'" *Cal. First Amendment Coal.*, 299 F.3d at 875 (quoting *Press-Enterprise II*, 478 U.S. at 8–9) (alteration in original).

i

Wood has at least raised serious questions about the historical openness surrounding the information he seeks. Because Wood seeks materials inextricably intertwined with the execution, our analysis focuses in part on the historic openness of the execution itself. *See, e.g.*, *Oregonian Publ'g Co.*, 920 F.2d at 1465–66 (recognizing a right of access to plea agreements and "related documents" by assessing the historical tradition of access to plea agreements alone); *Seattle Times Co.*, 845 F.2d at 1516–17 (recognizing a right of access to pretrial detention proceedings "and documents filed therein" by analyzing the limited history of formal and informal pretrial proceedings). As we noted in *California First Amendment Coalition*, executions in both England and the United States have historically been "open to all comers." 299 F.3d at 875. Public executions were historically "a fixture of American society," taking place in the middle of the day in "the public square." John D. Bessler, Death in the Dark: Midnight Executions in America 23 (1997). Even when executions were moved from the public square into prisons, "states implemented procedures that ensured executions would remain open to some public scrutiny." *Cal. First Amendment Coal.*, 299 F.3d at 875. As

15

we noted in *California First Amendment Coalition*, "[e]very state authorizing the death penalty currently requires that official witnesses be present at each execution." *Id.* at 875. Indeed, Arizona law explicitly requires the presence of "at least twelve reputable citizens." Ariz. Rev. Stat. § 13-758. In sum, the broad tradition of a public right of access to executions is indisputable.

Similarly, as Wood has demonstrated, important details about early methods of executions were also public. For example, public accounts in some states supplied information about both the types of ropes used in hangings and the manufacturers who provided them.[3] Public outcry over a reportedly botched hanging in Arizona led to debate over methods of execution and the eventual adoption in that state of the gas chamber. *See* Scott Christianson, *The Last Gasp: The Rise and Fall of the American Gas Chamber* 100-01 (2010). Similarly, the company that produced the cyanide used in Nevada's gas chambers, California Cyanide Company, publicly contracted with the state, and the identities of many of

---

[3] *See, e.g.*, Chris Woodyard, *Enough Rope: The Hangman's Rope in the Press*, Haunted Ohio (Jan. 19, 2013), http://hauntedohiobooks.com/news/enough-rope-the-hangmans-rope-in-the-press/ (summarizing news reports describing the types of ropes used in executions and the suppliers who produced them); *see also, e.g.*, *John Brown, Hanged with Kentucky Rope*, University of Kentucky Libraries, http://nkaa.uky.edu/record.php?note_id=1625 (last visited Jul. 18, 2014) (explaining that different ropes were submitted for use in the hanging of John Brown, were displayed to the public before the execution, and the strongest and most durable was selected).

the officials who handled the chemical up until the point of execution were a matter of public record. *See id.* at 76–79. Newspapers reported openly on gas chambers, describing their size, cost, and makeup, and explained that Eaton Metal Products Co., which delivered gas chambers to states like Arizona, had a "patent on the death machine."[4] Furthermore, although the method was not used in Arizona, public debate over the adoption of the electric chair in some states revolved in part around the specific details of the type of electricity and equipment used in the executions. *See* Stuart Banner, *The Death Penalty: An American History* 178-85 (2002). Finally, in some states, like Florida, state law dictated that the sheriff would serve as "deputy executioner" of the execution, providing a sense not just of the identity but, just as importantly, the qualifications of the person overseeing the execution. *See* Ken Driggs, *A Current of Electricity Sufficient in Intensity to Cause Immediate Death: A Pre-Furman History of Florida's Electric Chair*, 22 Stetson L. Rev. 1169, 1179–84 & n.52 (1993).

Wood also points to evidence that states have made details about their lethal injection drug protocols available to the public. Indeed, following litigation, the

---

[4] *Eight States Now Are Using Gas Chambers for Executions*, Sarasota Herald Tribune, Jan. 2, 1955, at 17, *available at* http://news.google.com/newspapers?nid=1755&dat=19550102&id=t-QhAAAAIBAJ&sjid=82QEAAAAI BAJ&pg=2642,267124.

State of Arizona released the manufacturer of the drug Pentobarbital, the drug's

National Drug Code, the drug's lot number, and its expiration date.  Notice of

Disclosure, *Schad v. Brewer*, No. 2:13-cv-13-02001-ROS (D. Ariz. Oct. 5, 2013),

ECF No. 24.  In response to a public records request, the state of Arkansas in 2013

released information about its lethal injection drugs, including the pharmaceutical

manufacturer and batch numbers.  And in Texas, the Attorney General only

recently changed course and started keeping secret the source of its lethal injection

drugs.[5]  Similarly, Louisiana has only recently attempted to shield the identities of

suppliers of lethal injection drugs.[6]

This evidence does not conclusively establish a historical tradition of public

access to the sources of lethal injection methods or the qualifications of

executioners.  Nor does it show with certainty that all states have acted alike in

terms of making execution-related information public, or that states have always

been the primary guarantor of transparency.  But such exhaustiveness is not

---

[5] Greg Abbott, *Keep Execution Drug Supplier Secret*, Austin American-Statesman, May 29, 2014, http://www.mystatesman.com/news/news/greg-abbott-keep-execution-drug-supplier-secret/nf9bQ/?icmp=statesman_internallink_textlink.

[6] Julia O'Donoghue, *Make Louisiana Execution Drug Suppliers Secret, State Prison Boss Asks Legislature*, New Orleans Times-Picayune, May 14, 2014, http://www.nola.com/politics/index.ssf/2014/05/louisiana_execution_drugs.html.

required at the preliminary injunction stage.  Instead, we ask only whether Wood raises "serious questions" going to the merits.  *Towery*, 672 F.3d at 657.

Moreover, the first factor in the *Press-Enterprise II* test is not necessarily dispositive.  *See Seattle Times Co.*, 845 F.2d at 1516 (noting that the "history and [] prevalent use of informal procedures" in pretrial detention proceedings, in lieu of an "unbroken history of public access," "should not automatically foreclose a right of access"); *see also Phoenix Newspapers*, 156 F.3d at 948 (noting that as to post-trial transcript access, even if the history factor was "not dispositive," the second factor would be).  Here, Wood has provided evidence that executions in general have long been open to the public, and that information regarding the methods of execution and the qualifications of the executioners have been open as well.  This evidence, at a minimum, raises "serious questions" as to the historical right of access to the information Wood seeks.

ii

In recognizing a qualified right of access to viewing the entirety of executions, we noted that "[i]ndependent public scrutiny . . . plays a significant role in the proper functioning of capital punishment."  *Cal. First Amendment Coal.*, 299 F.3d at 876.  The Supreme Court has stated that no rigid standard for appropriate methods of execution exists and that, in the Eighth Amendment

19

context, the Court must determine what type of execution constitutes cruel and unusual punishment "from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). As a result, "[a]n informed public debate is critical in determining" whether a specific execution method comports with this country's "evolving standards of decency." *Cal. First Amendment Coal.*, 299 F.3d at 876. Indeed, we have specifically held that "[t]o determine whether lethal injection executions are fairly and humanely administered, or whether they can ever be, citizens must have reliable *information* about the 'initial procedures,' which are invasive, possibly painful, and may give rise to serious complications." *Id.* (emphasis added). Providing access to executions also creates a sense of fairness that commands more respect for the judicial process from the public. *Id.*

   That same reasoning compels us to conclude that Wood has raised serious questions as to the positive role public access to the information he seeks would play in executions. There has been a seismic shift in the lethal injection world in the last five years, as states have struggled to obtain the drug traditionally used in

20

executions, thiopental.[7]  In response, states "began using [the drug] pentobarbital as a substitute," but its primary manufacturer, the pharmaceutical company Lundbeck, stopped selling the drug to prisons because it opposes the death penalty.[8]  States are now seeking new types and combinations of drugs, like Midazolam and Hydromorphone, and states are enacting laws to shield the identities not just of executioners, but of the companies that produce lethal injection drugs.[9]  *See, e.g.*, Ga. Code Ann. § 42-5-36.  But several flawed executions this year, including two in Oklahoma, and one in Ohio featuring the

---

[7] Erik Eckholm & Katie Zezima, *States Face Shortage of Key Lethal Injection Drug*, N.Y. Times, Jan. 21, 2011, http://www.nytimes.com/2011/01/22/us/22lethal.html.

[8] David Jolly, *Danish Company Blocks Sale of Drug for U.S. Executions*, N.Y. Times, Jul. 1, 2011, http://www.nytimes.com/2011/07/02/world/europe/02execute.html.

[9] Pete Williams, *Will Courts Lift Veil of Secrecy Around Lethal Injections*, NBC News, Feb. 27, 2014, http://www.nbcnews.com/storyline/lethal-injection/will-courts-lift-veil-secrecy-around-lethal-injections-n40171.

same two drugs at issue here, have sparked public curiosity and debate over the types—and quality—of drugs that should be used in lethal injections.[10]

Given the law in *California First Amendment Coalition*, and the factual backdrop of the past six months in particular, more information about the drugs used in lethal injections can help an alert public make better informed decisions about the changing standards of decency in this country surrounding lethal injection. Knowing the source and manufacturer of the drugs, along with the lot numbers and NDCs, allows the public to discern whether state corrections departments are using safe and reliable drug manufacturers. Similarly, knowing the specific qualifications of those who will perform the execution will give the public more confidence than a state's generic assurance that executions will be administered safely and pursuant to certain qualifications and standards.

Arizona argues that the information Wood seeks offers little value to the public debate and that releasing this information will serve instead to deter drug

_____

[10] *Id.*; Max Ehrenfreund, *Dennis McGuire Executed in Ohio with New Combination of Lethal Drugs*, Wash. Post, Jan. 16, 2014, http://www .washingtonpost.com/national/dennis-mcguire-executed-in-ohio-with-new-combin ation-of-lethal-drugs/2014/01/16/612e22a2-7ede-11e3-93c1-0e888170b723_story. html; *see also* Editorial, *Secrecy Behind Executions*, N.Y. Times, Jan. 29, 2014, http://www.nytimes.com/2014/01/30/opinion/secrecy-behind-executions.html; Megan McCracken & Jennifer Moreno, Op-Ed, *Secret Drugs, Agonizing Deaths*, N.Y. Times, Apr. 13, 2014, http://www.nytimes.com/2014/04/14/opinion/secret -drugs-agonizing-deaths.html?smid=fb-share&_r=2.

manufacturers from providing lethal injection drugs and lead to public disclosure of the identities of those who will administer the drugs. We recognize that the State has a strong interest in carrying out its criminal judgments. *Towery*, 672 F.3d at 657. But the State's argument ignores the ongoing and intensifying debate over lethal injection in this country, and the importance of providing specific and detailed information about how safely and reliably the death penalty is administered. Moreover, the State can point to no evidence in the record to support its claim that pharmaceutical companies will stop providing drugs if this information is released or that no alternatives are available even if some companies do change course. There is nothing in the record, save speculation, that manufacturers will not provide the product. Indeed, Arizona has continued to effectively administer the death penalty using domestically produced lethal injection chemicals since it released drug information in *Schad v. Brewer*. Similarly, the State fails to point to evidence to support its claim that releasing the qualifications of those administering the execution will lead to them being identified publicly.

In sum, Wood has raised serious questions on the merits as to the positive role that access to lethal-injection drug information and executioner qualifications will have in the public debate on methods of execution. And given the evidence

23

presented by Wood regarding the historical right of access, we conclude that Wood has raised serious questions as to whether a First Amendment right, in the context of a public executions, attaches to the specific information he requests.

C

We proceed to consider the remaining three *Winter* factors. First, Wood will face irreparable harm if the injunction is not granted. We have previously stated that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (alteration in original); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (same); *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (same). Here, as to Wood's specific claims, they likely will become moot after his execution.

Similarly, we have also stated that "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal quotation marks omitted). Because Wood has raised serious questions

24

going to the merits of his First Amendment claim, we conclude he has also established irreparable injury.

### D

Because we conclude only that Wood has raised "serious questions" going to the merits of his claim, he must also show that the balance of equities tips *sharply* in his favor. *Towery*, 672 F.3d at 657. We acknowledge that Arizona does have a "strong interest in enforcing its judgments without undue interference from federal courts." *Id.* at 661 (internal quotation marks omitted). The state's interest is especially strong in a case like this one, in which legal proceedings have continued for more than twenty years beyond the crime. *Bible v. Schriro*, 651 F.3d 1060, 1066 (9th Cir. 2011) ("[T]he further delay from a stay [of execution] would cause hardship and prejudice to the State and victims, given that the appellate process in this case has already spanned more than two decades.").

Nevertheless, we conclude the balance of equities here tips sharply in Wood's favor. Wood is seeking to enforce a public, First Amendment right. He wants a stay of his execution only until he receives the information he seeks. Thus, it is unlikely that granting the injunction would unnecessarily delay the state's ability to enforce its judgments. Moreover, as we discussed above, the State has failed to provide any record evidence of the damage it believes will occur if it is

25

forced to reveal this information. Given the small impact the injunction will have on the state, the importance of First Amendment rights generally, and the critical importance of providing the public with the information it needs to debate the most severe form of punishment that exists, we conclude that the balance of equities tips sharply in Wood's favor.

E

Finally, since Wood's execution would likely not be delayed much, if at all, by giving him the information he seeks, the public interest factor weighs in Wood's favor. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press*, 682 F.3d at 826 (internal quotation marks omitted). Indeed, as we discussed above, this information will play an important role in the ongoing and intensifying public debate over capital punishment and lethal injection methods specifically.

Arizona's recent history reinforces the role of this information in the public discourse. In the case of Donald Beaty, the State announced eighteen hours before the execution that it intended to switch to the use of a drug that it had never tested and in the use of which it had never trained its executioners. *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (Reinhardt, J., dissenting from the denial of

26

rehearing en banc). In the cases of Robert Towery and Robert Moormann, the state changed its written execution protocol at the last minute, then changed course yet again, informing the court just hours before argument that it was switching the method of execution "because it discovered at the last minute that the originally-planned drugs had expired" a month before. *Towery*, 672 F.3d at 652–53. Here, the State has announced that it will use an untested protocol, and that it reserves the right to use Pentobarbital if it becomes available. The recent history in Arizona does not provide a reliable source of data as to its current method of execution, underscoring the need for transparency.

Information concerning execution protocol is not only of general interest to the public, it is important for consideration by the courts. For example, data concerning gas chamber executions informed our decision to ban such executions. *Fierro v. Gomez*, 77 F.3d 301, 306-09 (9th Cir. 1996), *judgment vacated*, 519 U.S. 918 (1996). It also informed our decision to sustain hanging as a method of execution in *Campbell v. Wood*, 18 F.3d 662, 681-87 (9th Cir. 1994). We, and the public, cannot meaningfully evaluate execution protocol cloaked in secrecy. It is in the public's interest that Wood's injunction be granted.

III

27

Because we conclude that Wood has raised serious questions as to the merits of his First Amendment claim; that the balance of equities tips sharply in his favor; that he will face irreparable harm if the injunction is not granted; and that the injunction is in the public interest; we conclude that the district court abused its discretion in denying Wood's preliminary injunction request. We do not decide with certainty that a First Amendment right exists to the information Wood seeks, nor do we resolve the merits of the Plaintiffs' underlying § 1983 claim. We do, however, reverse the district court's denial of Wood's preliminary injunction motion. We grant a conditional preliminary injunction, staying Wood's execution until the State of Arizona has provided him with (a) the name and provenance of the drugs to be used in the execution and (b) the qualifications of the medical personnel, subject to the restriction that the information provided will not give the means by which the specific individuals can be identified. Once he has received that information, the injunction shall be discharged without more and the execution may proceed.

**REVERSED.**

28

<u>Counsel</u>

Jon M. Sands, Federal Public Defender, Dale A. Baich & Robin C. Konrad (argued), Assistant Federal Public Defenders, District of Arizona, Phoenix Arizona, on behalf of Plaintiff-Appellant.

Thomas C. Horne, Attorney General, Jeffrey A. Zick, Chief Counsel, John Pressley Todd, Special Assistant Attorney General, Jeffrey L. Sparks (argued) & Matthew Binford, Assistant Attorneys General, State of Arizona, Phoenix, Arizona, for Defendants-Appellees.